STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

09-509


WEST CAMERON PORT, HARBOR AND TERMINAL DISTRICT

VERSUS

LAKE CHARLES HARBOR & TERMINAL DIST., ET AL.


**********
APPEAL FROM THE
THIRTY-EIGHTH JUDICIAL DISTRICT COURT
PARISH OF CAMERON, NO. 10-17271
HONORABLE H. WARD FONTENOT, DISTRICT JUDGE

**********

ULYSSES GENE THIBODEAUX
CHIEF JUDGE

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Sylvia R. Cooks, John D. Saunders, Elizabeth A. Pickett, and Shannon J. Gremillion, Judges.

COOKS, J., dissents and assigns written reasons.

GREMILLION, J., joins in Judge Cooks' dissent.

REVERSED AND RENDERED.

Roy Clifton Cheatwood
Steven Franklin Griffith, Jr.
Aubrey Bernard Hirsch, Jr.
Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
201 St. Charles Avenue - Suite 3600
New Orleans, LA 70170
Telephone:  (504) 566-5200
COUNSEL FOR:
    Defendant/Appellant - Lake Charles Harbor & Terminal District

Michael Kenneth Dees
P. O. Box 3753
Lake Charles, LA 70602-3753
Telephone:  (337) 439-3661
COUNSEL FOR:
    Defendant/Appellant - Lake Charles Harbor & Terminal District

**G. William Jarman**
**Linda Sarradet Akchin**
**Glenn Michael Farnet**
**Lana D. Crump**
**Kean Miller, Hawthorne D' Armond, McCowan & Jarman, LLP**
**P. O. Box 3513**
**Baton Rouge, LA 70821-3513**
**Telephone:  (225) 387-0999**
**COUNSEL FOR:**
        **Defendant/Appellant - Cameron LNG, LLC**

**Randall Kurt Theunissen**
**Neil Gregory Vincent**
**David J. Ayo**
**Allen & Gooch**
**P. O. Box 81129**
**Lafayette, LA 70598-1129**
**Telephone:  (337) 291-1240**
**COUNSEL FOR:**
        **Plaintiff/Appellee - West Cameron Port, Harbor and Terminal District**

**Henry L. Yelverton**
**820 Terry Lane**
**Lake Charles, LA 70605**
**Telephone:  (337) 477-6423**
**COUNSEL FOR:**
        **Defendant/Appellant - Lake Charles Harbor & Terminal District**

**Terrence D. McCay**
**One Lakeshore Drive - Suite 1150**
**Lake Charles, LA 70629**
**Telephone:  (337) 430-0350**
**COUNSEL FOR:**
        **Defendant/Appellant - Cameron LNG, LLC**

**THIBODEAUX, Chief Judge.**

Defendants, Lake Charles Harbor and Terminal District (LCP) and Cameron LNG, L.L.C. (Cameron LNG), appeal the trial court's grant of summary judgment in favor of the plaintiff, West Cameron Port, Harbor, and Terminal District (West Cameron), and the denial of LCP's and Cameron LNG's motions for summary judgment. LCP and Cameron LNG argue that the trial court erred in its interpretation of statutory and other authorities with respect to LCP's power to lease to Cameron LNG certain land—outside LCP's territorial bounds—to construct and operate a liquified natural gas (LNG) facility. LCP and Cameron LNG further maintain that the trial court erred by transferring the ownership of the land at issue to West Cameron. Cameron LNG also argues that because federal law preempts West Cameron's claim, the trial court erred by denying its lack of subject matter jurisdiction exception.

We reverse because we find that LCP had authority as a Local Sponsor to amend the lease subject to which it bought the land outside its territorial bounds, given (1) that the amendment did not require LCP to conduct port, harbor, and terminal activities in Cameron Parish, and (2) the amendment did not fundamentally change Cameron LNG's operations so as to, in effect, constitute a new lease. We also find that because this case involves interpretation and construction of state law, Cameron LNG's lack of subject matter jurisdiction exception is without merit.

I.

**ISSUE**

We shall consider whether LCP, which indisputably has authority to purchase land in Cameron Parish to maintain the condition of the Calcasieu River Channel (the channel), may amend the lease on the land it owns in Cameron Parish where:

(1) LCP bought the land in question subject to an existing lease to a third party that operated a liquified petroleum gas (LPG) facility, and

(2) the third party constructed an LNG plant pursuant to the amended lease.

## II.

## <u>FACTS</u>

LCP is a landlocked port because the only access for ships to LCP is through the channel that runs through West Cameron's territory. The channel is a navigable waterway subject to a servitude in favor of the federal government. The Louisiana legislature gave the Governor the authority to enter into agreements with the federal government on behalf of the State or its political subdivisions to assure local cooperation with the federal government. La.R.S. 38:81.[1] In 1961, Governor Jimmie Davis designated LCP the Local Sponsor for the purposes of channel improvements. This designation obligated LCP, without cost to the United States, to provide lands, easements, rights-of-way, and spoil-disposal areas necessary for the construction and maintenance of the channel.

---

[1] The Governor on behalf of the state or . . . any section of the state may make and execute with any person, including the Secretary of the Army, the Chief of Engineers of the United States Army, or any other authorized representative of the federal government, any contract, agreement, arrangement, or undertaking, transaction, designed, or intended to carry out, effect, accomplish, or secure the benefits and obligations of any state or federal law, now existing or hereafter enacted, with respect to the control of flood waters, the navigation or use of the rivers flowing through this state or . . . diversion channels for flood waters and areas, and all similar undertakings, whether specifically mentioned herein or not.

. . . .

The Governor may utilize to whatever extent they are empowered by law to function the various levee boards or boards of levee commissioners of this state, the Department of Public Works, or any other state board, commission, agency, or political subdivision. These authorities shall, to the fullest extent of their capacity, fully cooperate and coordinate their efforts under his direction in carrying out and accomplishing the obligations and requirements of the agreements and undertakings.

La.R.S. 38:81.

The following is a brief history of LCP's land acquisitions in Cameron Parish. A review of exhibits submitted to this court reveals a lack of evidence that LCP bought, acquired, or expropriated any land in Cameron Parish or anywhere else outside its territory prior to its Local Sponsor designation in 1961. None of the deeds to land in Cameron Parish LCP referenced are before 1961.

Exhibit # D-24a demonstrates that in 1948, LCP's board adopted a resolution in which it relied on its "plenary jurisdiciton [sic] over the Lake Charles Harbor, Calcasieu River and all terminal facilities therein *within the said Parish of Calcasieu . . . .*" (Emphasis added). LCP board resolved that it would give assurances of local cooperation to the Secretary of the Army for "that portion of the said work of improvement *within the territorial area of the City of Lake Charles and the Parish of Calcasieu, Louisiana, [which] is within the jurisdiction of the [LCP] . . . .*" (Emphasis added). From this, it is clear that LCP started to act on behalf of the United States to maintain the channel around 1948 but only within Calcasieu Parish.

Attached to the exhibit referencing the 1948 resolution is another board resolution dated February 8, 1961—three weeks after the Governor designated LCP the Local Sponsor on January 18, 1961. There, LCP board resolved that it would provide to the United States assurances of local cooperation "for both Calcasieu and Cameron Parishes, Louisiana . . . ."

Exhibit # D-74, an affidavit of Channing F. Hayden, Jr., LCP's Director of Navigation and Security, reveals that before 1960, the "local assurances and obligations were supplied by a combination of the Calcasieu Parish Police Jury, the Cameron Parish Police Jury and the LC Port." That changed in 1960 when Louisiana's legislature designated the State of Louisiana to be responsible for the assurances of local cooperation. Then, the Governor designated LCP the Local

3

Sponsor. Hayden goes on to state that "*[a]s the result of its role as the 'local sponsor' of the Channel, the LC Port has thus entered into a series of resolutions, agreements and assurances over the years to the United States and the Corps in connection with the construction, maintenance and operation of the Channel.*" (Emphasis added). Hayden then writes that "[i]n Cameron Parish alone, in order *to discharge its responsibilities as 'local sponsor'* for the Channel Project, the LC Port has thus been required to secure more than fifteen (15) such [dredge disposal] sites . . . ." (Emphasis added). Furthermore, Hayden states that "[l]ikewise, the LC Port has obtained numerous other rights of entry, servitudes, easements and/or acquisitions in connection with property located in Cameron Parish in discharge of its responsibilities to serve *as the local sponsor* of the Channel . . . ." (Emphasis added).

In 1999, LCP acquired, for dredge disposal purposes, about two hundred acres of land along the channel in Cameron Parish for five hundred and fifty thousand dollars. At the time of the acquisition, a portion of the land was leased to a third party that operated an LPG facility on that land. That LCP had authority to buy this land is not in dispute.

Both Hayden and Adam McBride, LCP's Director, swore that LCP bought the property in question under the port's Local Sponsor authority. In his affidavit, Hayden writes that "[i]n further discharge of its duties and responsibilities *as the 'local sponsor'* for the Channel, the LC Port also purchased on February 1, 1999 a track [sic] of land along the Channel and near Hackberry, LA in Cameron Parish (the 'Cameron LNG Property'), which is currently leased to Cameron LNG . . . ." (Emphasis added). Exhibit # D-73, McBride's affidavit, reveals that "[t]he LC Port purchased the Cameron LNG Property in connection with its duties to provide

4

for dredge soil disposal areas adjacent to the Channel *in its role as 'local sponsor'* for the channel." (Emphasis added).

In 2001, the operator of the LPG facility (Cameron LNG's predecessor) proposed to amend the existing lease to allow for the construction and operation of an LNG plant. With the support of Cameron Police Jury and West Cameron, LCP entered into the amended lease.

Prior to the construction of the LNG facility, the future operator of the facility had to obtain permits and authorizations from various institutions, including the United States Federal Energy Regulatory Commission (FERC). Throughout this lengthy regulatory process, West Cameron and Cameron Parish Police Jury encouraged the development of the LNG project by writing letters of support to FERC.

In its suit, West Cameron sought declaratory relief, injunctive relief, and damages because LCP allegedly engaged in port, harbor, or terminal operations outside its territorial limits. West Cameron requested that the property in question be transferred from LCP to West Cameron. LCP filed a peremptory exception of nonjoinder of Cameron LNG that the trial court granted. West Cameron then amended its petition to name Cameron LNG as a defendant.

LCP answered the petition and filed a reconventional demand. LCP sought declaratory relief that it may maintain the Channel as a Local Sponsor, that the ownership and the lease of the property in question was lawful, and that West Cameron did not have an exclusive authority to operate port, harbor, and terminal facilities within Cameron Parish.

Cameron LNG answered West Cameron's petition and asserted a cross-claim against LCP for breach of warranty of peaceful possession. Cameron LNG

argued that by filing the peremptory exception of nonjoinder of Cameron LNG, LCP breached its obligation to keep Cameron LNG in peaceful possession of the property. Cameron LNG also filed an exception of lack of subject matter jurisdiction arguing that Congress, by enacting the Natural Gas Act, 15 U.S.C. § 717, intended to occupy the field of natural gas regulation. Cameron LNG maintained that West Cameron's claims impermissibly interfered with the implementation of the FERC order approving the sitting of the Cameron LNG facility, making West Cameron's claim preempted by the federal law. Agreeing that there were no material facts in dispute, all parties moved for summary judgment.

The trial court granted a summary judgment in favor of West Cameron and denied LCP and Cameron LNG's motions and exception. The trial court found that LCP legally bought and owned the land. Yet, the trial court held that by amending the lease, LCP engaged in port, harbor, and terminal activity outside its territorial jurisdiction, thereby making the lease illegal. The trial court then enjoined LCP from owning or operating port, harbor, and terminal facilities through its lease of the property and transferred the ownership of the property to West Cameron, along with its effects, i.e., the amended lease and the past revenue from it. This transfer was subject to the repayment to LCP of the original purchase price and the legal interest.

III.

**STANDARD OF REVIEW**

Appellate court reviews summary judgment de novo. *Guilbeaux v. Times of Acadiana, Inc.*, 96-360 (La.App. 3 Cir. 3/26/97), 693 So.2d 1183, *writ denied*, 97-1840 (La. 10/17/97), 701 So.2d 1327.

IV.

## LAW AND DISCUSSION

This is a case of first impression. It is clear that LCP purchased the land in question under its Local Sponsor authority. We first determine whether LCP, nonetheless, has, under its enabling statutes, the power to acquire land outside its territorial bounds. This is important because land acquisitions under the Local Sponsor authority are limited to those properties that are necessary for the maintenance of the channel. If LCP has authority to acquire land in Cameron Parish under its enabling statutes, the consideration as to whether LCP exceeded its Local Sponsor authority would become unnecessary. This is because LCP's enabling statutes allow LCP to acquire and lease land for a much broader variety of purposes than does the Local Sponsor designation.

After a careful examination below, we conclude that under its enabling statutes, LCP has no power to acquire land outside its territorial bounds. Therefore, we shall have to consider next whether LCP exceeded its Local Sponsor authority by amending the lease subject to which it legally bought the land. We shall then address the residual issues the parties raised.

### (1) LCP's Authority to Acquire Land Outside its Territorial Limits

We first consider and apply our rules of statutory construction. We then examine the impact of the attempted amendment to LCP's enabling statutes. We conclude by considering the contemporaneous construction doctrine in the context of LCP's extraterritorial land acquisitions.

7

There is no question that LCP bought the property at issue under its Local Sponsor authority. The brief overview of LCP's land acquisitions in Cameron Parish discussed above leaves no doubt. These acquisitions were under the authority of the designation supplied by the Governor and not under the authority the legislature granted to LCP in its enabling statutes. Hayden and McBride's affidavits erase any uncertainty as to which source gave LCP the authority to buy the property in question.

After a careful review of LCP's enabling statutes *in pari materia*, this court concludes that LCP has no authority under its enabling statutes to buy land outside its territorial bounds listed in La.R.S. 34:201. Louisiana Revised Statutes 34:203, titled "Powers of board; title to structures and facilities," 34:215, titled "Powers and authority of district," and 34:206, titled "Acquisition of lands," contain provisions regarding LCP's land acquisition authority. Thus, LCP "may acquire land necessary for the business of the district . . . ." La.R.S. 34:203(A)(2)(c)(iii). Moreover, LCP has the authority "to acquire, by right of eminent domain, purchase, lease, or otherwise, the land that may be necessary for the business of the district, including industrial plant sites and necessary property or appurtenances thereto. . . ." La.R.S. 34:215(3). Finally, LCP's enabling statute our legislature specifically titled "Acquisitions of land" states that

> [t]he board may acquire by purchase, donation, expropriation, lease or otherwise, any and all lands *in the district* needed for railways, warehouses, docks, wharves, sheds, buildings, canals, channels, slips, basins and other facilities to be owned and operated by the board or to lease

---

[2]"[Latin clause meaning 'general things do not derogate from specific things'] The doctrine holding that general words in a later statute do not repeal an earlier statutory provision dealing with a special subject." BLACK'S LAW DICTIONARY 692 (7th ed. 1999).

> to others for manufacturing, commercial and business purposes to promote the industrial development of the district and it may provide for the payment of such land out of the funds under its control not otherwise specially appropriated.

La.R.S. 34:206 (emphasis added).

In LCP's enabling statutes, the legislature did not specifically authorize LCP to acquire land outside its territorial bounds. Yet, only one out of the three provisions quoted above, La.R.S. 34:206, contains language that specifically limits LCP's land acquisitions to LCP's territorial limits.

Some of the other La.R.S. 34:203 and La.R.S. 34:215 sections that deal with matters other than land acquisitions include "within the district" or similar limiting language. For example, LCP "may acquire or construct industrial plant buildings with necessary machinery and equipment *within the district*." La.R.S. 34:203(A)(2)(c)(iv) (emphasis added). Relying on this variable presence of the limiting language in La.R.S. 34:203 and La.R.S. 34:215, LCP argues that while some of LCP's activities, such as construction of industrial plant buildings, must be within LCP's territorial limits, other activities, such as land acquisition, need not be so limited. We agree that there is an ambiguity with respect to land acquisitions in La.R.S. 34:203 and in La.R.S. 34:215 because of the variable presence of the limiting language. We do not agree with the conclusion that LCP may acquire land anywhere in this state.

The legislature enacted the original versions of La.R.S. 34:203 and La.R.S. 34:206 in the 1920s. The legislature did not enact La.R.S. 34:215 until 1973. The original version of La.R.S. 34:203 did not contain any specific provisions with respect to land acquisitions. The legislature amended La.R.S. 34:203 and La.R.S. 34:206 in 1958. Thereby, the legislature added, among other provisions, what is now

9

34:203(A)(2)(c)(iii), the provision that relates to land acquisitions upon which LCP heavily relies in its brief. The 1958 amendment to La.R.S. 34:206 added a lease and other provisions not relevant to this case. The legislature amended La.R.S. 34:203 in 1987 and in 1991, but those amendments are also not important to the resolution of this case. The legislature enacted La.R.S. 34:215 in 1973 and never amended that provision upon which LCP relies for the authority to acquire land anywhere when it deems the land necessary for its business.

The law should be applied as written if it is clear, unambiguous and does not lead to absurd consequences. *Martin v. Safeway Ins. Co. of La.*, 08-1419 (La.App. 3 Cir. 4/15/09), __ So.3d __, 2009 WL 995798. "Laws on the same subject matter must be interpreted in reference to each other." La.Civ.Code art. 13. This means that where statutory provisions are in conflict, laws *in pari materia* should be construed together and harmonized, if possible. *Killeen v. Jenkins*, 98-2675 (La. 11/5/99), 752 So.2d 146.

"[W]hen two acts are clearly irreconcilable and are so inconsistent that the two cannot have concurrent operation, then the latest enactment should be applied." *Id.* at 148. Yet, it is also true that "when two statutes applicable to the same subject appear to be in conflict, the statute that is more specifically directed to the matter at issue must prevail . . . ." *Andre v. Constr. Material Shop*, 93-1212, p. 7 (La.App. 1 Cir. 3/11/94), 633 So.2d 1313, 1318. Furthermore, "the title of a law may be examined to determine its purpose . . . ." *Bellsouth Telecomms., Inc. v. City of Lafayette*, 05-1478, p. 11 (La.App. 3 Cir. 1/5/06), 919 So.2d 844, 852.

The courts presume that the legislature "enacted the law with full knowledge of all other laws pertaining to the same subject matter" and that "every provision of law was intended to serve some useful purpose . . . ." *Martin*, __So.3d

10

at __, 2009 WL 995798, at *3 (quoting *Ransome v. Ransome*, 01-2361 p. 8 (La.App. 1 Cir. 6/21/02), 822 So.2d 746, 754). Courts do not presume that "the lawmaker intended for any part of a law to be meaningless . . . ." *Id*. (Emphasis omitted). Finally, "when a law is susceptible to two or more interpretations, that which affords a reasonable and practical effect to the entire act is preferred to one that renders part of the act nugatory." *Id*.

As their respective titles indicate, La.R.S. 34:203 and La.R.S. 34:215 are outlines of the LCP's powers and are general in nature. On the other hand, La.R.S. 34:206 specifically deals with land acquisitions. Louisiana Revised Statutes 34:206 clearly limits LCP's authority to acquire land to its territorial bounds. Moreover, although our legislature enacted La.R.S. 34:215 after the legislature's last amendment to La.R.S. 34:206, the language relevant to the land acquisitions in La.R.S. 34:215(3) is almost identical to the language in La.R.S. 34:203(A)(2)(c)(iii) and (iv), which is an earlier statute. The only significant difference is the enumeration of the acquisition modes in La.R.S. 34:215. These same acquisition modes are listed in La.R.S. 34:206. With respect to LCP's authority to acquire land outside its bounds, La.R.S. 34:215 and La.R.S. 34:203 are identically silent.

Moreover, La.R.S. 34:215(3) and La.R.S. 34:206 are not clearly irreconcilable and are not so inconsistent that the two cannot have concurrent operation. An example may make this conclusion clearer: if La.R.S. 34:215(3) read specifically that LCP may acquire land outside its bounds, then the conflict between La.R.S. 34:215(3) and La.R.S. 34:206 would have been more evident. As it is, the variable presence of the limiting language in La.R.S. 34:215 makes the land acquisition provision, *as written in that statute*, slightly ambiguous with respect to

11

the extraterritorial land acquisitions. La.R.S. 34:215(3) does not conflict with *another statute*, i.e., La.R.S. 34:206.

If one reads La.R.S. 34:215(3) in conjunction with La.R.S. 34:206, it becomes clear that the two statutes are not irreconcilable. Instead, the inevitable conclusion is that LCP has no power to acquire land outside its territorial limits. Therefore, even though the legislature enacted La.R.S. 34:215 after the last amendment to La.R.S. 34:206, the later general statute did not repeal the earlier statute dealing with the specific subject of land acquisitions. Thus, our guiding principle of statutory construction here is that specific provisions apply over the general ones.

The following example further aids our reasoning here. Indisputably, LCP may not levy or collect taxes outside its territorial bounds. Yet, La.R.S. 34:203(A)(2)(c)(xiii) that deals with the levy of taxes, like La.R.S. 34:203(A)(2)(c)(iii) that deals with land acquisitions, contains no limiting language. With respect to both powers, there are additional specific statutes that limit LCP's authority to its territorial limits.

Where the legislature did not enact specific statutes with respect to the powers listed in La.R.S. 34:203 and La.R.S. 34:215, LCP's argument that some and not its other powers are limited to its boundaries may be true. Yet, it is not so with the power to acquire land. This power has a specific statute, La.R.S. 34:206, and LCP's construction of La.R.S. 34:203 and 34:215 would render La.R.S. 34:206 nugatory and superfluous. Because our task here is: (1) to harmonize all provisions with respect to LCP's power to acquire land; (2) to adopt the interpretation that affords a reasonable and practical effect and not the one that renders the statute that specifically deals with the land acquisitions nugatory; and, (3) not to render any part

of the law dealing with LCP's land acquisitions meaningless, we conclude that under its enabling statutes, LCP has no authority to acquire land outside its territorial limits.

### (b) The Effect of Contemporaneous Construction Doctrine

While Louisiana courts sharply limit the application of the contemporaneous construction doctrine, we nonetheless may consider a port's interpretation of the statutes under which it operates. *See Clark v. Bd. of Comm'rs, Port of New Orleans*, 422 So.2d 247, 251 (La.App. 4 Cir. 1982), which quoted *Liquidation of Canal Bank & Trust Co.*, 30 So.2d 841, 849 (La.1947), for the proposition that, "the generally accepted rule [is] that the contemporaneous construction given a statute by those charged with its execution is entitled to great weight and should not be disregarded except for cogent reasons, [but] this rule is not controlling, particularly if such construction is erroneous."

Here, LCP's actions indicate that, until very recently, it did not construe its enabling statutes to mean that LCP had the power to acquire land in Cameron Parish. For example, LCP's resolution of 1948, exhibit # D-24a, demonstrates that in 1948, LCP considered itself bound by its territorial limits with respect to land acquisitions. Exhibits submitted to this court indicate that it was not until 1961, approximately three weeks after the Governor designated LCP a Local Sponsor, that LCP started to acquire property in Cameron Parish. Thus, even after the legislature amended La.R.S. 23:203 in 1958 to include the language upon which LCP currently relies to support its position, LCP acquired no land outside its bounds until its Local Sponsor designation.

Furthermore, when LCP did acquire land in Cameron Parish after its 1961 Local Sponsor designation, it relied on that authority and not on the authority of its enabling statutes to acquire the land. McBride and Hayden's affidavits provide

13

ample support for this conclusion. Thus, since its creation until very recently, LCP itself did not act as if it construed its enabling statutes to authorize LCP's land acquisition anywhere outside its territorial bounds.

These considerations buttress our conclusion that LCP has no authority under its enabling statutes to acquire land outside its territorial bounds.

**(2) LCP's Authority to Amend the Lease on the Land in Question**

Because LCP has a limited authority to acquire land in question for the construction and subsequent maintenance of the channel, we now examine whether LCP exceeded this authority by *amending* the lease subject to which it bought the land.[3]

(a) Local Sponsor's Lack of Duty to Dissolve a Pre-existing Lease with a Party that Conducts Activities Unrelated to Channel Maintenance.

The Governor's designation reads that the local cooperation with the United States means to "[p]rovide without cost to the United States *all* lands,

---

[3]LCP argues that under its enabling statutes, i.e., La.R.S. 34:203(A)(2)(c)(v) and La.R.S. 34:215(4), it may lease the land for processing, manufacturing, commercial, and business purposes no matter how or where it acquired the land. Specifically, LCP maintains that even if it acquired land under its authority as a Local Sponsor, it may lease the land according to the terms of La.R.S. 34:203(A)(2)(c)(v) and La.R.S. 34:215(4). In essence, LCP takes a position that the leasing provision and the land acquisition provision of La.R.S. 34:203 and 34:215 are independent of each other. In effect, LCP would "bootstrap" its Local Sponsor authority to its enabling statutes.

The question as to whether LCP may *lease* property it acquired under the authority other than its enabling statutes is not before this court. Instead, the question we need to resolve is whether LCP has authority to *amend* the pre-existing lease on the property it bought under its Local Sponsor authority. Therefore, we do not address whether the lease provision and the land acquisition provision in La.R.S. 34:203 and in 34:215 are independent of each other.

In addition, the recurrent argument in LCP's brief is that if it has the power to sell the property in question, it should logically follow that it has the power to lease it because the power to sell is greater than the power to lease. While LCP cites several cases for this proposition, we note that the greater right does not *necessarily* include the lesser one. *See City of Shreveport v. Case*, 4 So.2d 801 (La.1941) (holding that even if the city, in the protection of its water supply, had the right to prohibit all craft upon the waters of the lake, it does not necessarily follow that the city had the right to regulate the use of water craft by imposing muffler requirements).

In any event, as explained above, in this case, we need not address the issue of LCP's ability to lease the lands it acquired under its Local Sponsor authority. Our issue is a more limited one, i.e., whether LCP may amend a pre-existing lease.

easements, rights-of-way, and spoil-disposal areas necessary for the construction and for *subsequent maintenance* of the project . . . ." (Emphasis added). The project is the "improvement to the Calcasieu River and Pass Navigation Channel." The relevant questions here is: once LCP determines that a piece of land is necessary for its business as a Local Sponsor to maintain the channel, and that land happens to be encumbered by a lease which does not require *LCP* to engage in any port, harbor, or terminal activity unrelated to channel maintenance,[4] but does allow the lessee to conduct such activities, does LCP have an obligation to dissolve the lease once it purchases or expropriates the land? The answer to this question is important because if LCP does not have an obligation to dissolve such a lease, the lessee's ownership and operation of port facilities on the land LCP owns becomes irrelevant to the question whether *LCP* engages in port activities. A related question is: would a failure to dissolve the lease exceed LCP's Local Sponsor authority? The answer to both of these questions is "no."

The designation authorizes LCP to secure *all* lands, easements, etc., necessary for the channel maintenance. It does not require LCP to secure only unencumbered lands. Moreover, it does not require LCP to eliminate the encumbrances once it acquires the land even if, as here, the encumbrance allows the *lessee* to conduct port activities.[5] Finally, if the encumbrance does not require LCP

---

[4]We note that under LCP's Local Sponsor designation, LCP probably has authority to conduct certain port operations in Cameron Parish. For example, if LCP needs a dock, wharf, or pier to unload dredge materials on the property it owns in Cameron Parish, LCP probably may construct, own, and operate the dock, wharf, or pier for that purpose. Thus, the issue in this case is not whether LCP may generally conduct port operations outside its territorial limits. The issue is whether it may do so in a way so as to exceed its Local Sponsor authority, i.e., conduct port operations in Cameron Parish unrelated to channel maintenance.

[5]As stated in the "Facts" section of this opinion, prior to the amendments of the lease to construct an LNG facility, the lessee operated an LPG facility. In connection with the LPG operations, the lessee, *before* the lease amendments, owned and operated docking, terminal, and other port facilities on the property in question.

to engage in port, harbor, or terminal activity unrelated to channel maintenance, it does not conflict with any entity's enabling statutes.

<u>(b) LCP's Authority to Amend the Pre-existing Lease</u>

The next question is whether LCP exceeded its Local Sponsor authority by amending the pre-existing lease. We find significant the following two considerations. First, we need to decide whether the lease amendment amounted to LCP's engagement in port, harbor, or terminal operations unrelated to channel maintenance outside its territorial jurisdiction. This is important because simultaneous and unlimited port, harbor, or terminal operations by two different authorities in the same geographical area may lead to a conflict resulting in neither being able to effectively perform their duties, thereby impeding commerce activities.

Second, we need to decide whether the amendment changed the lease so fundamentally as to, in effect, constitute a new lease. This is important because then the question becomes not whether LCP may merely *amend* an existing lease but whether LCP may *lease* property it acquired under its authority as a Local Sponsor.

We conclude that this amendment of the pre-existing lease did not amount to an engagement in port operations. West Cameron strenuously argues that McBride, LCP's Director, admitted that the operations of Cameron LNG necessarily involve LCP's port activity. Yet, this is not what McBride stated. West Cameron's attorney specifically asked McBride: "[i]s the Cameron LNG facility a port, harbor, and terminal service that gets activity of the Lake Charles Port . . .?" McBride did not answer in the affirmative but, instead, replied that "[t]he lease is a – an activity of the Port." We note that an activity of the port is not necessarily a port activity. For example, when LCP expropriates property in Cameron Parish as a Local Sponsor, it acts as a port, the Lake Charles Port, because this entity cannot act as something other

16

than the Lake Charles Port. Nevertheless, LCP, thereby, does not necessarily engage in a port activity. Similarly, the act of lease amendment can be an activity of the port, the Lake Charles Port, without being a port activity.

Moreover, whether LCP engaged in port, harbor, or terminal activities is, in our view, a legal conclusion. Thus, even if McBride conceded that LCP conducted port activities, this court is in no way bound by his opinion.

Admittedly, Cameron LNG engages in port activities by virtue of loading, unloading, and docking of vessels. Yet, LCP conducts none of those activities. Nor does it own any docks, wharves, slips, and other facilities necessary for port, harbor, or terminal operations on the land in question. Instead, Cameron LNG owns, operates, and maintains all of those facilities. LCP simply receives lease payments.

We also conclude that the amendment of the original lease did not change operations of the parties subject to the lease so drastically as to constitute, in effect, a new lease. While the size and the cost of the facilities on the leased land increased dramatically, as well as the lease payments LCP collects, the nature of the operations changed from handling liquified petroleum gas to handling liquified natural gas. In other words, the lessee did not, for example, change its business to a retail store or a theme park. The essence of the operations is still limited to transporting, handling, processing, etc. of petroleum products.

Having the above two determinations in mind, we do not conclude that LCP exceeded its Local Sponsor authority by amending the pre-existing lease. True, the Governor did not specifically authorize LCP to lease anything under its Local Sponsor designation. It is also true that the designation document did not expressly prohibit the leasing activity. The question then becomes: whether the language

17

"necessary for the maintenance" of the channel encompasses LCP's ability to amend encumbrances subject to which the Local Sponsor acquired the property where (1) the amendment did not require LCP to engage in port, harbor, or terminal activities unrelated to channel maintenance, and (2) did not fundamentally change the nature of the lessee's operations so as to, in effect, constitute a new lease. We conclude that it does.

The phrase "necessary for subsequent maintenance" is broader than something like, "necessary for dredging and disposal of dredging materials" but not as broad as something like, "necessary for the business." "Necessary for subsequent maintenance" may or may not encompass leasing activities and may encompass some leasing activities and not others.[6] We need not resolve these questions now. This is because we hold that this language is broad enough to include amendments to the lease subject to which LCP acquired the property where (1) the amendments to the lease did not require LCP to engage in port, harbor, or terminal activities unrelated to channel maintenance in Cameron Parish, and (2) the amendment did not fundamentally change the nature of the lessee's operations.

Based on the considerations above, LCP's failure to dissolve the pre-existing lease and LCP's subsequent amendment of that lease were within LCP's authority and are, therefore, valid. Thus, we need not address the impropriety or propriety of the trial court's transfer of the property in question to West Cameron. Similarly, our decision renders moot Cameron LNG's arguments with respect to warranty breach.

---

[6]For example, we do not reach the question as to whether LCP could lease to a dredging subcontractor a portion of the land it acquired as a Local Sponsor for that subcontractor to dispose of the dredge materials in the course of channel maintenance.

Finally, this case involves interpretation and construction of the state statutes and the Governor's order pursuant to a state legislature's delegation of authority. It has nothing to do with natural gas or energy regulation. Therefore, Cameron LNG's assertions that the trial court lacked subject matter jurisdiction because of the federal preemption are without merit.

V.

## CONCLUSION

The trial court's judgment in favor of West Cameron Port, Harbor and Terminal District is reversed. This court finds that the Lake Charles Harbor and Terminal District's failure to dissolve a pre-existing lease and the subsequent amendment of that lease were legal and, therefore, valid exercises of Lake Charles Harbor and Terminal District's Local Sponsor authority.

Costs of this appeal are assessed to West Cameron Port, Harbor and Terminal District.

**REVERSED AND RENDERED.**

**WEST CAMERON PORT, HARBOR AND TERMINAL DISTRICT
VERSUS
LAKE CHARLES HARBOR & TERMINAL DISTRICT**

**COOKS, J., Dissent.**

The Lake Charles Harbor and Terminal District (LCP) purchased a 215 acre tract of land in 1999 located within the jurisdictional boundaries of the West Cameron Port, Harbor and Terminal District (West Cameron). Both entities are political subdivisions of the State of Louisiana created by specific enabling legislation, and the boundaries of each are statutorily fixed. It is undisputed that the land at issue is wholly within the legislatively defined territorial boundaries of West Cameron.

This land was purchased by Stanolind Oil & Gas Co., the predecessor to Amoco, in 1935. Beginning in 1938, the property owner granted various rights-of-way and spoil dumping privileges to the USA, State of Louisiana, and LCP–the last entered in 1998 and effective through April 15, 1999. All but one of these servitudes/easements were provided to all of the noted governmental entities **free of charge**.

Sometime between April 28, 1998 and February 1, 1999, Amoco sold the subject property to Deep Sea, LLC. On February 1, 1999, Deep Sea, LLC, through its managing partner David Reinauer, sold the subject property to LCP for the sum of $550,000.00, without warranty of title, and with an assignment to LCP of an existing surface lease in favor of Deep Sea, LLC and Dyengy Midstream, Inc. Hackberry LNG Terminal, LLC (Hackberry) acquired all right, title, and interest in

1

the surface lease from its parent company, Dynegy Midstream Services, Ltd. Partnership, sometime before December 31, 2002. On the same date, Hackberry and LCP entered into an agreement entitled "Second Amendment To Surface Lease" which dramatically changed the original surface lease agreement and by its own recitations changed "*the use of the premises*" leased.[1]

The new lease agreement provided for the construction and operation of a new facility with the capacity to deliver liquified natural gas by marine vessels and via a new 35 mile pipeline to be constructed on the subject property passing through neighboring parishes. Additional acreage was added in this "amended lease," and the duration of the lease was changed to 30 years, plus six five-year options at the lessee's discretion. The annual rental was changed from $25,000.00 to $356,040.00 with provisions for additional increases using the CPI Index. This "Second Amended Lease" further provided that **wharfage fees** are to be paid to LCP in addition to the new base rent, with a requirement of a minimum wharfage fee, and various other charges. When all is said and done, these fees combined with the rental payments will net an estimated Sixty-Five Million Dollars ($65,000,000.00) over the life of the lease to LCP's coffers. West Cameron Port will net zero, and Cameron Parish will receive no revenue–only "the bill for police and fire protection." The property is not subject to *ad valorem* taxation because it is owned by a political subdivision of the state as a local sponsor, namely LCP, and it has been specially exempted. *See* La.Const. art. VII, §21(A), and *Slay v. Louisiana Energy & Power Auth.*, 473 So. 2d 51, 53 (La. 1985).

Additionally, the "Second Amended Lease" included the following provisions

---

[1]The original surface lease was between Amoco Production Company and Cities Services Company executed in 1978. The lease was first amended in 1984 to add additional footage to a right-of way for ingress and egress.

2

(emphasis added):

> Lessee acknowledges that vessels calling at the LNG facilities may also be subject to a channel user fee **should the District impose such a fee** at a future date in accordance with a general channel user fee plan authorized by and in accordance with applicable law to be **implemented by the District on all commercial vessels** subject to the requirements of pilotage. **Lessee, however, shall not be responsible for such channel usage fees or for arranging or requiring calling vessel owners and charterers regarding such channel user fees.**

> Additional Charges Legally Accessible by the District. **Lessee hereby acknowledges that the base rent and the wharfage fees are not intended, and will not include, reduce or abate, any charges legally accessible by the District against vessels calling on the LNG Terminal or using any other facilities or waterways or otherwise subject to the District's jurisdiction to assess fees and such fees and charges will be separately assessed, charged and paid by the vessel's owners or charterers in accordance with the District's assessments of same,** all in accordance with applicable laws and regulations.

> Additional Rights-of Way. The District will provide any rights-of-way across the Additional District Property (as defined in Paragraph 14 below), located north of the Amended Leased Premises, required to allow construction and operation of the LNG Facilities; including primarily, but without limitation, access rights-of way and pipeline for the related natural gas pipeline.

> Channel Access and Usage. Lessee and the District agree and acknowledge that nothing in this Lease amendment is intended to, or shall be construed as, granting vessels calling at Lessee's facilities any greater or lesser priority with regard to channel access and usage than existing users of the channel and vessels calling at Lessee's facilities are subject to the same vessel traffic controls and management as the District may, in accordance with applicable laws, impose on other vessels using the Calcasieu River Ship Channel.

Although the noted future channel activities, like the previously mentioned ones, are all earmarked to occur wholly within the jurisdictional limits of West Cameron Port, no efforts were made by LCP to secure a valid intergovernmental agreement with West Cameron Port to jointly engage in the venture. The lease was subsequently amended three more times. The last and fifth amendment to the lease is dated September 20, 2006.

The majority opinion first reviews the pertinent statutes relating to the

3

territorial jurisdiction of the two port districts and correctly concludes neither district has any authority to engage in port activity outside its territorial boundaries. Turning its sights specifically on LCP, the majority rejects LCP's argument, steadfastly advanced below and on appeal, that it has co-existing authority with West Cameron Port under its enabling statute to acquire land for port activity outside its territorial jurisdiction. I join the majority in this finding because the law is well settled on this issue and has been since the inception of the two ports.[2]

Nonetheless, LCP argues its grant of authority as Local Sponsor for the channel effectively expands its territorial limits and sanctions its continued port operations in Cameron Parish. Again, the majority finds LCP's reliance on the local sponsorship provision for authority to conduct port activity in Cameron Parish is not well placed because that authority, likewise, was limited in scope and encompassed "channel maintenance" operations. This finding is also well rooted in the law, and I, too, join the majority in repeating what the legislature has already declared.

Our difference lies in the majority's ultimate finding that LCP, though adrift at sea on all of its arguments, is saved by the *facts of the case* as the majority sees them. The majority states that no one disputes this property was acquired by LCP for dredge disposal under its Local Sponsor authority, and that, having so acquired the property encumbered with a lease, it may then "amend" that lease, *if in so doing*, LCP **does not** engage in port activity within WCP's jurisdiction. The majority then finds LCP is not engaging in port activity in Cameron Parish, and the amendments did

_____

[2]In 2006, after West Cameron filed this suit, House Bill H.R. 292, 2006 Leg., Reg. Sess. (La. 2006) was proposed to specifically authorize LCP to exercise powers granted to it in its enabling statutes "within or without the territorial limits of the district." This Bill also proposed to amend La.R.S. 34:206 to grant LCP authority to acquire all lands "and improvements thereon as necessary to accomplish the purposes for which the district is created regardless of where such lands or improvements are located." The Bill additionally proposed a provision which would ratify and affirm any actions taken by LCP's board outside the district's territorial limits prior to July 1, 2006. This bill never became law.

not "fundamentally change the nature of the lessee's operations so as to, in effect, constitute a new lease." According to the majority, the question of whether LCP is engaging in port activity is a "legal question." In truth, this question is a factual one, which compels an inescapable legal result.

There is no genuine dispute that LCP is engaged in port activity in Cameron Parish–it said so below and insisted it had the unfettered right to do so. And there is absolutely no basis in law or fact to find that the multiple amendments to the lease did not change the nature of Cameron LNG's and LCP's operations at the site and in Cameron Parish.

The evidence in the record filed on appeal demonstrates from the very beginning LCP contemplated purchasing the property in Cameron Parish **with the intent to operate and develop the property for port business**, an activity authorized only by its enabling legislation and expressly limited to its territorial jurisdiction. *See* La.R.S. 34:206. The record squarely places at issue the majority's finding that LCP acquired the property for dredge disposal and the purchase was necessary for channel maintenance. The record shows this land was used since 1938 for spoil disposal. The record also reflects, and LCP admitted below, that this land was no longer being used for spoil disposal at the time it decided to purchase the property and has not been used for spoil disposal since its acquisition in 1999. At the time LCP purchased the property there was a servitude in place for potential spoil disposal that was granted to LCP **at no cost.** It simply defies all logic to believe that LCP decided to pay $550,000.00 to acquire a right it already possessed to dispose spoil–an activity it stopped doing on the subject land years before and has not done since.

LCP's own official minutes and resolutions, entered into evidence below,

5

memorialized its underlying purpose for purchasing the property. At a special meeting held on January 18, 1999, LCP's minutes reflect the following (emphasis added):

> This property has improvements–the dock and a slip. The slip is approximately 900 feet deep and 1200 feet wide. It could easily be dredged to 40 feet. There are spoil areas on each side that could be used. A vicinity map showing the general location, a site data sheet, and information describing improvements located on the property were before the Board.

> Dynergy had approximately 90.03 acres under lease. The lease has six (6) five-year options. The option will come up in approximately one year. If the lease is renewed and the options are exercised, the lease currently would pay the District about a ten percent (10%) return on the $550,000.00. **If the lease is not extended, the District would have to look for another use of the property.** In Mr. Wiseman and he's judgment, **the property is extremely valuable to the potential use of the Port.** There are 1700 feet that front on deep water. Part of the property has been built up to an approximate 15-foot elevation as a result of the spoil disposal areas. **It would serve as a very good site for potential development by the Port**. Mr. Dees showed a photograph of the property to the Board and pointed out the improvements, the leased acreage, and the boundaries of the property.

> Deep water property is not being created. When the Port has a chance to purchase this type of property, Staff feels it is a good investment and something that **fits in the mission of the Port for long-range planning.**

> Mr. Watts pointed out that this property was in Cameron Parish. He looked forward to some benefits filtering down to Cameron.

Additionally, LCP's official Resolution No. 99-001, which formally approved the purchase, does not contain a single mention of spoil disposal, dredging, Local Sponsor authority, or channel maintenance. In fact, the **three recited official reasons** for acquiring the subject property stated in LCP's Resolution No. 99-001 are:

> WHEREAS, the property contains a slip that is approximately 900 feet deep and 1200 feet wide and a 300–foot dock; and

> WHEREAS, presently there is a tenant on the property; and

> WHEREAS, if tenant does not renew lease options, the property is extremely valuable to the potential use of the District.

6

NOW THEREFORE, BE IT RESOLVED BY THE BOARD OF COMMISSIONERS OF THE LAKE CHARLES HARBOR AND TERMINAL DISTRICT IN SPECIAL SESSION CONVENED THAT:

SECTION 1: All of the foregoing introductory provisions are hereby made a part of this Resolution and the Board of Commissioners of the Lake Charles Harbor and Terminal District does hereby approve purchase of approximately 218 acres of property located on the Calcasieu Ship Channel, as described in Exhibit"A" attached hereto and made a part thereof, from Deep Sea, L.L.C. for the purchase price of $550,000.00...

The record overwhelmingly demonstrates that LCP intended from the outset to purchase this property for "development" of its port and intended fully to conduct port activities, including specifically *regulating marine traffic of all ships using the channel* traveling to and from the site located in Cameron Parish.[3] The minutes of LCP's meeting on October 14, 2002, reflect LCP was adamant that it, not Dynegy, had the authority, and would in fact "regulate" the marine traffic in this part of the channel in Cameron Parish, and the new lease had to contain a provision granting it full authority to do so. The minutes of LCP dated October 14,2002, state (emphasis added):

> This **new LNG facility would generate 175 new LNG ships a year on the channel**.[text deleted] If Dynegy had all these additional ships, Staff felt it was very important that a clear statement was included in the lease agreement **that Dynegy recognized the authority of the District to, in effect, act as a traffic cop**. The **District believed it had the authority for the whole channel to regulate the traffic and how it flowed in and out of the ship channel**. Staff wanted **an expressed provision in the lease that acknowledged that by Dynegy**. Dyengy agreed to that on the telephone, but then after their attorney finished with it, it was deleted and they basically inserted No. 11, which stated that Dynegy would determine what commercially reasonable measures needed to be

---

[3] As the majority acknowledges, LCP's enabling statute, La.R.S. 34:206, does not authorize LCP to purchase property for any purpose outside its territorial jurisdiction. Under the authority granted by the governor designating LCP as local sponsor, its activities as such are limited to channel maintenance for navigation. Indeed, the governor's authority to designate any port commission as local sponsor under La.R.S. 38:81 is limited to control of flood waters, navigation or use of rivers flowing through the state, and diversion channels for flood waters or similar undertakings. The governor's grant of authority to any port commission is also expressly limited in La.R.S. 38:81to the "extent they are empowered by law to function." LCP is not empowered by law to acquire property outside its territorial jurisdiction for port development or investment.

taken by them so that the traffic flowed through the channel like it was suppose to.  Mr Dees stated he could not recommend it to the Board and Mr. Jordan had the same problem with it.  Staff was requesting that the Board approve the revised proposed lease terms and conditions except for Dynegy's No. 11 and **authorize Staff to reinstate the provision, Item 9, the District regulate the traffic**. [text deleted] Mr. Dees replied they were putting that back in.  Dr. DeRouen clarified that the District's verbiage was being put back in No.9 and Dynegy's No. 11 would be eliminated. [text deleted] **Mr. Williams asked if the District could regulate the channel to give Dynegy the full 175 ships a year.  Mr. Dees stated that had been the main issue the whole time.  CMS was proposing 175 ships and Dynegy was proposing 210.  Between the expansion at CMS and Dynegy were 400 ships**. [text deleted] Dynegy had come to the table and agreed paying the District on a per unit basis. The more they utilized the facility, the more revenue the District had. [ text deleted]

There were so many more companies and industries that this affected that the District needed to be very careful what it did at this location. **Dr. DeRouen stated that since Dynegy was way up the channel, the District could not let them have control of the channel for them to determine what was economically feasible with their ships and involve Conoco, CITGO, everyone else and the District for ships being shut out**.  Mr. Dees stated that Conoco and CITGO were the two largest users.

The final lease amendment, indeed, contains the provision insisted upon by LCP making it expressly clear that it, not its tenant Dynegy, has the authority to **"regulate"** all marine traffic in this part of the channel located entirely within WCP's territorial jurisdiction, and to exercise full control and authority **including assessment and collection of fees from Dynegy's ships and all ships using this portion of the channel and all ships calling upon this port**.  The minutes of LCP dated October 14, 2002, and later the lease provision, went so far as to expressly point out that:

> Dynegy would pay any general channel users fees in addition to that.  If the District in a couple of months levied a general user fee, which they had been talking about and having notices, etc., they would pay that on top of this unit charge.

Further, as clearly evidenced in LCP's minutes, the Port Director of the Lake Charles Harbor and Terminal District, Mr. Robert Adam McBride (McBride),

testified he performs the same functions of Port Director both over the properties owned by LCP in Calcasieu Parish and in Cameron Parish. He admitted LCP, **"act[s] as a port"** (emphasis added) in West Cameron's port district. McBride also testified he controlled what actions take place on the property located in Cameron's district owned by LCP and he gives permission in his capacity as Port Director for what activities and actions are authorized on the property located in West Cameron's territory. Moreover, McBride, when asked whether the services and facilities which would be taking place on the Sempra development would be "port facilities" responded, **"There will be dock and port facilities as part of the overall project under development"** (emphasis added) and he admitted that **compensation for such dock and port facilities conducted in Cameron Parish will be paid to LCP**. When asked about the provisions of the contract between LCP and the Sempra project, McBride testified:

A. (McBride) They outline the rental payments and other terms and conditions associated with the property. Yes.

Q. One of which is encaptioned "Wharfage" correct?

A. It's encaptioned "Wharfage," yes.

Q. And it deals with decathons (ph.) to be received by the Lake Charles Port for a certain flow through or pass through vessel, correct?

A. That's correct.

Q. For vessels–for docking there, correct?

A. Yes.

Q. (Mr. Dees) And in regard to Mr. Theunissen's question that there are going to be port activities at the Sempra site, that is correct. There are going to be but there are not as of today; is that right?

9

A. There are not– there are no current port activities at the site. There is construction activity underway there at present.

Q. (Mr. Thuenissen) In followup to that specific question, the lease is for that very purpose in your receiving rentals upon that lease now and have been for a time frame?

A. **The lease is for the purpose of receiving vessels with cargo. To that extent, its port authority** as well as the rental of the site and the property adjacent to it for that purpose. (emphasis added)

Q. And the construction, you said y'all don't do activity out there. Have you visited the site physically?

A. I have visited the site. Yes.

Q. For what purpose?

A. To observe.

Q. And to make sure that things are consistent with the lease?

A. Just to observe the activity that's underway?

Q. And have any of your port board members gone?

A. To the best of my knowledge, there have been port board members.

Q. For what purpose?

A. To observe the activity of the site.

Clearly, the stipulated facts and other submissions in the record support the trial court's finding that LCP's arrangement with Cameron LNG constitutes port activities outside of its territorial jurisdiction. When the case was heard below LCP did not contest that *the lease and all the activities it encompassed* constituted "port activities." In its Answer to the suit at Paragraph 20, LCP, in fact, admitted it was engaging in "port services and activities," including the leasing of its properties in

10

Cameron Parish (emphasis added):

> The LC Port, under its powers and authorities found at La.R.S. 34: 201, et seq., has, for over eighty (80) years, managed, maintained, regulated, and operated extensive port facilities and the Calcasieu River Ship Channel (the "Channel") in both Calcasieu and Cameron Parishes; acquired in both parishes, voluntarily and by way of expropriation, numerous pieces of property either in full ownership or by way of easements or rights of way; acted in accordance with the prior designations of the governor and the attorney general as the "Local Sponsor" for the entire Channel; and otherwise provided and performed, in accordance with its stated powers, port services and activities, *including the leasing of its properties in both Cameron and Calcasieu* Parishes."

The entire discussion below, at the hearings on the exceptions and on the motions for summary judgment, all of which were submitted as part of the record, involved the fees to be collected by LCP as part of the "lease arrangement" with LNG, which included wharfage. The majority makes no mention of the wharfage fees and other fees assessed by LCP against vessels operating in Cameron Parish and being collected by LCP. Even Cameron LNG's attorney discussed wharfage in his brief remarks to the court. When the fees for wharfage and other traditional port activities were discussed, LCP's response was the same as it admitted in answering the suit–it possesses concurrent jurisdiction and can conduct port activities in Cameron Parish. The lease itself, and the specific language addressing wharfage and other traditional port activities, were all discussed and were central to the trial court's ultimate determination in the case. In at least two or three instances the trial court asked if there were any disputed facts in the case and each time LCP responded "No."

Mr. Dees, LCP's trial attorney arguing in the trial court said (emphasis added):

> [A] piece of property that's on there, that is facilitating the development of a billion dollar LNG facility **with deep-draft ships back and forth, is – is not even, I don't think, in question, as to whether that is a legitimate Port activity.**

And, Mr. McBride in his testimony specifically testified:

11

Q. (Mr. Theunissen) Is the Cameron LNG facility a port, harbor and terminal service that gets activity of the Lake Charles Port: yes or no?

A. (McBride) The lease is a– an activity of the Port.

Q. And the money that ya'll get for the lease involves a surface lease and so much money for vessels being offloaded – put through–

A. Yes.

Q. –crew boats

A. That's correct.

Regulating marine vessels calling on an inland port, imposing and collecting wharfage fees on marine vessels calling on an inland port, imposing and collecting channel user fees on marine vessels calling on an inland port, and policing marine vessel traffic are undisputably port, harbor, and terminal activity. A port may engage in "port activities" in more than one way–it is not necessary for it to own the buildings, the boats, or even the docks, or to hire employees to work at the plant. Leasing property it owns to third parties for the purpose of *charging fees on their operations* on the site is what many ports do, including LCP. This is what LCP is doing in Cameron at the LNG site and this is precisely what it "amended" the lease to do. When LCP acquired the subject property, it was burdened by an existing lease that incidentally affected port activities within Cameron Parish. The power to regulate this port activity, however, remains with West Cameron Port. LCP "amended" the lease multiple times making significant material changes so as to thereafter engage in port, harbor and terminal activity within WCP's jurisdiction. LCP cannot expand its jurisdiction and authority by such means.

The Louisiana Supreme Court long ago addressed this argument in *Board of Com'rs for the Port of New Orleans v. New Orleans & S.F. R. Co., et al.*, 36 So. 837 (La.1904). In that case, the City of New Orleans authorized construction and

maintenance of a belt railroad, which at certain points passed over and through public wharves, that were being used as public landings by the Port of New Orleans. By specific legislation the Port of New Orleans had exclusive authority for the control and administration of the harbor, port, **wharves**, and landings of the port of New Orleans. The court, relying on the legislative grant of authority to the Port, stated (emphasis added):

> [T]he state, an incorporeal being, charged with the administration of the corporate property in question, must necessarily act through an agent, and that whereas, until 1896, it acted through the city of New Orleans, it then appointed as its agent for the purposes of such administration the board of port commissioners, withdrew from the city all authority that had ever been granted to it in that behalf, 'save,' as this court has decided, 'in connection with *private* wharves,' and, in language at once more specific and more comprehensive, conferred that authority upon the agent so appointed, and that the constitutionality of the statute by which this change of agents was affected has not been attacked by any of the pleadings in this case.

The court continued in its reasoning (emphasis added):

> In conclusion, it may be remarked that, whilst the city of New Orleans has no present jurisdiction over the wharves and landings of the port of New Orleans, as such, it is quite likely that she has jurisdiction in other directions, **the exercise of which may incidentally affect that property**, just as the exercise by the states of the power to enforce quarantine and inspection laws may incidentally affect commerce, the power of which is vested in Congress. **Such jurisdiction does not, however, extend to matters relating merely to the control and administration of the property, and hence does not authorize the interference therewith which is threatened and complained of in this case.**

The Supreme Court made it clear, the jurisdiction expressly granted to the Port of New Orleans could not be impinged upon by the City of New Orleans just because the City of New Orleans may have other jurisdictional authority that may incidentally affect the same property. Likewise, just because LCP has authority to use or acquire the present property for spoil disposal and maintenance of the channel under its local sponsor authority, and the property was burdened by a prior lease which *incidentally*

13

involved the use of the shipping channel, the power to collect fees "as a port commission" for wharfage and other port activities was vested in Cameron and none other. The sponsorship authority granted LCP does not extend to matters relating to "wharfage fees," and "fees against vessels calling on the LNG terminal or using any other facilities or waterways or otherwise subject to the District's jurisdiction to assess fees and such fees and charges will be separately assessed, charged, and paid by the vessel's owners or charterers in accordance with the District's assessments of same." (Second amendment to lease). Such fees and charges are exclusively reserved for WCP to assess and collect within Cameron Parish. These are not incidental matters.

Neither is the language "necessary for subsequent maintenance" of the channel broad enough to expand LCP's authority in Cameron Parish, allowing it to amend the original surface lease to collect fees based on port operations at the site. This argument was firmly rejected long ago by this court in an opinion authored by Judge Saunders. In *Twin Parish Port Com'n v. Berry Bros., Inc*., 95-425 (La.App. 3 Cir. 10/4/95), 663 So.2d 257, *writ denied*, 95-2665 (La. 1/5/96), 666 So.2d 288, we addressed the question of whether the Twin Parish Port Commission, a political subdivision of the state, possessed any inherent powers to enact regulations in fields where it lacks an affirmative grant of statutory or constitutional authority. This court concluded the port commission did not possess any "inherent powers" beyond those expressly granted by statute or the constitution. Finding the port commission had no authority to enact an ordinance such as Ordinance No.3, prohibiting the discharge of oil, grease, and refuse into Lake Peigneur, Judge Saunders wrote (emphasis added):

> By analogy, we conclude that the trial court acted correctly with regard to Ordinance No. 3. In accord, *Desormeaux Enterprises, Inc. v. Village of Mermentau*, 568 So.2d 213 (La. App. 3 Cir. 1990). Its decision is supported not only by legislation granting the state broad powers to

14

regulate the environment, **but by the *absence* of statutory authority granting the Twin Parish Port Commission concurrent jurisdiction**.

*Id*. at 260.

This court clearly held the port commission in that case had no more authority than that which is statutorily or constitutionally granted it by express provisions. The court recognized that the local citizens and local authorities certainly have an interest in "vigilantly safeguarding" the environment. *Id*. at 261. Nevertheless, it is the state which has "exclusive" jurisdiction to safeguard the water quality of Lake Peigneur as such authority is "ordained by the laws of this state *and its people*." *Id.* As the court explained: "The Commission is not permitted to issue regulations in its own right, however, absent constitutional or statutory authority which it currently lacks." *Id.*

Likewise, the Louisiana Second Circuit Court of Appeal, in *Lake Providence Port Commission v. Bunge Corporation*, 193 So.2d 363 (La.App. 2 Cir., 1967), *writ refused*, 195 So.2d 147 (La.1967), held that absent a positive grant of power to the port commission by the Louisiana Constitution, the commission did not have the authority to prohibit the defendant landowner from constructing facilities on its land merely because the facility would be situated entirely on the bank of the Mississippi River within the port commission's district.

> [T]he constitutional grant to regulate commerce and traffic within the port area did not necessarily bestow upon the commission the authority to Prohibit defendant from constructing the proposed facilities on its own land merely because such construction was to be situated entirely on the bank of the Mississippi. We are in accord with this conclusion. To construe plaintiff's authority to be extensive enough to prohibit defendant from building on its own land, although located on the river side of the Mississippi River levee and falling within the broad definition of 'river banks' would require a positive grant of power to the prot commission by the Louisiana Constitution.

*Id.* at 367.

Article 14, Section 31, of the Louisiana Constitution pertains to the creation of port districts and empowers the legislature to create port, harbor, and terminal districts as political subdivisions of the State. It empowers the legislature to "fix their territorial limits" and to define their duties, powers, "and jurisdiction." The second circuit was unpersuaded by the port commission's argument that it objected to the defendant's construction based on its duty to protect and increase the commission's income and thereby relieve the burden of the taxpayers. Though the court noted such a concern was "admirable and noble," it was "incompatible with the type of use reserved for the public by Louisiana Civil Code Article 455" and nothing in the grant of authority to the port commission could be construed as a positive grant of authority to infringe upon this express right. *Id.*

LCP attempts to make the same argument here, asserting that the revenue it receives from Cameron LNG is necessary for its port operations, meaning that because LCP needs money to conduct its operations including spoil disposal and channel maintenance, the receipt of these funds constitutes activity "necessary for the maintenance" of the channel as authorized in the sponsorship legislation. The majority acknowledges "[t]he Governor did not specifically authorize LCP to lease anything under its Local Sponsor designation." LCP has no "positive" grant of authority to collect fees based on port activities in Cameron Parish. As the court stated in *Lake Providence Port Commission v. Bunge*, 193 So.2d at 367, such an argument is incompatible with the exclusive jurisdiction and authority specifically bestowed upon WCP, which expressly reserves authority and jurisdiction to it to collect fees for wharfage, and to regulate marine vessel traffic and other port activities on property wholly situated in Cameron Parish for the benefit of the people of this state.

16

Further, the record establishes beyond genuine dispute that the "amendments" to the original "surface lease" significantly *changed the use of the premises*, a fact clearly stated in both the "Second Amendment To Surface Lease" and the "Fifth Amendment To Surface Lease," which contain the following (emphasis added):

> WHEREAS, Lessee is proposing to construct and operate an liquified natural gas ("LNG") marine delivery, storage and regasification terminal, including two unloading docks, three storage tanks and associated equipment to vaporize the LNG into natural gas and to process the LNG to extract volumes of natural gas liquids (and to store and transport such natural gas liquids) and a related gas pipeline to transport revaporized LNG from the leased premises, all to be located on the premises subject to the Lease (the "LNG Facilities"), *but such efforts require additional acreage and <u>a change in the use of the premises subject to the Lease</u>.*"

The new facility includes a marine delivery shipping terminal providing open access to tankers as well as a new 35-mile pipeline. As noted above, the "Second Amended Lease" added a provision basing payments to LCP on wharfage on a per-marine-vessel basis and acknowledged LCP's authority to impose wharfage fees and other fees **upon all vessels calling on this port including LNG's ships as well as all other marine "vessels calling at the LNG facilities."** Likewise, in its "Notice of Application" filed with the United States Of America Federal Energy Regulatory Commission, dated June 26, 2002, Hackberry LNG Terminal, LLC, predecessor to Cameron LNG, states (emphasis added):

> Take notice that on May 30, 2002; [as revised on June 24, 2002], Hackberry LNG Terminal, L.L.C. (Hackberry LNG), 1000 Louisiana, Suite 5800, Houston, Texas 77002, filed an application **seeking authorization to site, construct and operate a liquified natural gas (LNG) terminal** located at Hackberry, Louisiana, **and a new 35 mile natural gas pipeline** in Cameron, Calcasieu, and Beauregard Parishes, Louisiana. The purpose of the LNG terminal is **to provide open access LNG tanker services to shippers importing LNG**. Hackberry LNG is **requesting authorization to offer open access terminalling services** at market-based rates; open access transportation service on the proposed pipeline will be separately charged, and calculated on a cost-of-service basis.

17

"..."

Hackberry LNG also requests approval of the Hackberry LNG terminal **as the place of entry for the imported LNG supplies under Section 3(a) of the Natural Gas Act** and Part 153 of the Commission's regulations (Docket No. CP02-378-000). Hackberry LNG also requests authorization in Docket No. CP02-376-000 to provide the LNG terminalling services on a firm and interruptible basis pursuant to Section 7( c ) of the NGA and Part 284 of the Commission's Regulations. In addition, Hackberry LNG seeks authorization, pursuant to Section 7 (c) of the NGA and Part 157, Subpart A of the Commission's Regulations, **to construct and operate a 35 mile pipeline and related facilities** to transport natural gas on an open access basis under Part 284.

According to the majority, the five lease "amendments" are without consequence because they did not change the operations of the lessee or the parties so drastically as to constitute a new lease. And, as such, LCP's sponsorship authority to do what is "necessary for maintenance of the channel" was broad enough to allow it to "amend" the lease. These "amendments" amounted to the construction of a billion dollar plant and $65,000,000.00 in potential payments to LCP. Prior to the changes, LCP was not receiving any rentals based on the lessee's operations on the property. It was simply an owner possessing property burdened by an existing lease, from which it was entitled to collect an annual rental of $25,000.00 per year for surface use, subject only to an annual cost of living adjustment.

The real question in this case has not changed from the one argued below by all the parties and addressed by the trial court–that is whether LCP's port operations in Cameron Parish exceeds its authority. The answer is inescapably, "yes," because the legislature has not elected to expand LCP's jurisdiction beyond that statutorily granted to it. The jurisprudence likewise is well settled that its authority is special and defined territorially.

The Louisiana First Circuit Court of Appeal has addressed the question of whether political subdivisions of the state granted specific territorial jurisdiction may

18

own land and perform functions outside of their own territorial limits and within the territorial limits of another political subdivision. In *City of Baker School Board v. East Baton Rouge Parish School Board*, 99-2505 (La.App. 1 Cir. 2/18/2000), 754 So.2d 291, the First Circuit rendered a well-reasoned opinion as to why such intrusion upon the territorial jurisdiction of neighboring political subdivisions cannot be allowed. In that case, the First Circuit explained that public education is a function of the state as the sovereign. Each school board in performing its function acts as the sovereign administering public education within its territorial jurisdiction much as each port district is a political subdivision of the state performing its designated functions within its territorial limits.

> The ownership, management and control of property within a school board's district is vested in the district, in the manner of a statutory trustee, for the accomplishment of its duty. *See Orleans Parish School Board v. City of New Orleans* 56 So. 2d 280, 284 (La.App. Orleans 1952). The general rule of ownership of property of school districts was stated in 68 Am. Jur. Schools Sect. 74 (1993), as follows:
>
> The ownership of school property is generally in the local district or school board as trustee for the public at large. School property is thus considered public property and is not to be regarded as the private property of the school district by which it is held or in which it is located. The Baker Board, as successor to the Parish Board for the accomplishment of the duty to educate, became the successor of the property through which the duty is to be accomplished. **While actual ownership remains with the public at large, title follows the agency obligated to carry out the responsibility**. Title to the school property at issue transfers to the Baker Board.
>
> Concerning the issue of compensation, we find none due the Parish Board. There has been no taking. The transfer of legal title from the Parish Board to the Baker Board is merely the transfer from one trustee to another. As stated above, the public owns the school property. (Emphasis added)

*City of Baker School Board v. East Baton Rouge Parish School Board*, 754 So.2d at 292.

We cited *Baker School Board* as the basis of our decision in *Ebey v. Avoyelles*

19

*Parish School Board,* 03-765 (La.App. 3 Cir. 12/17/2003), 861 So.2d 910, *writ denied,* 04-0196 (La. 3/26/2004), 871 So.2d 349, and held that the ownership of school board property is "generally in the local district or school board as trustee for the public at large." *Id.* at 915. Based upon this proposition, we held that local school boards have the right to administer and manage Section 16 lands within their district.

Our courts have treated hospital districts in the same manner. In *Hospital Service District Number 2 Of The Parish Of LaFourche v. Hospital Service District No. 1 OF The Parish Of Terrebonne*, 97-1792 (La.App. 1 Cir 6/29/1998), 716 So.2d 168, *writ denied,* 98-2039 (La. 11/13/98), 730 So.2d 450, the First Circuit addressed the question of whether Terrebonne HSD could own and operate a medical facility located inside the territorial jurisdiction of Lafourche HSD. Terrebonne HSD argued that the provisions of specific articles regarding the conduct of the hospital districts' business (allowing for enhanced competition) should be placed on an equal footing with the enabling legislation which created the districts and defined their territorial boundaries. The First Circuit rejected that argument. The appellate court examined the enabling statutes, and the enhanced competition statutes, which contained general language such as "notwithstanding any other law to the contrary." The appellate court reasoned that the enhanced competition statutes must be interpreted and applied "within the overall statutory scheme governing the hospital service districts." *Id.* at 170. The court expressly held (emphasis added):

> The topic specific competition articles **do not and cannot, by inference, re-write or supersede the enabling statute; and, thereby, extend the authority of the hospital service districts beyond that granted by the legislature**. Thus, the competition articles provide that the hospital service districts' ability to compete, with the 'market for health care services' within its authorized district boundaries, is enhanced,'notwithstanding any other law to the contrary' that would impede such competition. La.R.S. 46:1077; see also La.R.S. 46: 1074.

> To allow the districts' authority to be unilaterally extended into

20

another parish would result in the evisceration of smaller, poorer, or more rural hospital service districts created to provide services to all the residents of the particular district. The more affluent outside district would willingly serve the areas of needs of the local district or parish that presented a picture of profit, but might not want to provide general unprofitable services for all the residents of the local district or parish.

If consolidation or cooperation is beneficial to the public, the hospital service districts may cooperate and may share inter-parish services, if the requisite parties agree. La.R.S. 46: 1051. **However, by allowing a public hospital service district to compete with, and possibly cannibalize or destroy, a public district in another parish, many areas of the less affluent, smaller, or rural district could be left without the very medical services that the legislature hoped to promote."**

*Id.*

Likewise in this case, as candidly acknowledged by LCP in oral argument, West Cameron has no office, no money, no nothing. West Cameron's authority could indeed be "cannibalized, destroyed and eviscerated" by the actions of LCP in conducting the present port activities within its territorial jurisdiction.

Further, LCP's attempt to bootstrap its port activities in Cameron Parish with its authority as a landowner of the property does not change the illegal nature of its operations. Our courts have answered the question of a mixed use of property subject to one political subdivision's jurisdiction by another political subdivision exercising a specifically authorized activity, such as use for spoil disposal. The Louisiana Fourth Circuit Court of Appeal, in *River Marine Contractors, Inc. v. Board of Com'rs for St. Bernard Port, Harbor and Terminal Dist.*, 605 So.2d 654 (La.App. 4 Cir., 1992), *writ denied,* 607 So.2d 568 (La. 1992), reviewed a declaratory judgment determining which of two port authorities had jurisdiction over a facility within the jurisdiction of the Port of St. Bernard upon which a tenant would be engaging in a mixed use of the facility, i.e. by handling both domestic and international cargo. In that case, the Port of St. Bernard purchased certain tracts of land within its

jurisdiction in St. Bernard Parish. River Marine entered into a preliminary lease agreement with the Port of St. Bernard under which the port allowed River Marine to conduct a feasability study for using the location for construction and operation of a marine cargo facility by River Marine which would handle both domestic and international cargo. The port agreed it would lease the property to River Marine if the results of the study were favorable. Both the Port of St. Bernard and Port of New Orleans claimed regulatory jurisdiction over the proposed facility. The applicable legislation provided the Port of St. Bernard with regulatory authority over any tenant on the subject property as to *domestic cargo* but expressly excluded *international cargo*. Other legislation vested express authority to the Port of New Orleans over any tenant on the subject property for *international cargo*. River Marine sought a declaratory judgment to determine which port had authority to issue the permits and regulate operation of River Marine's mixed-use facility. The court looked to the express language in the enabling legislation concerning the Port of St. Bernard and the Port of New Orleans. The legislation spelled out the territorial jurisdiction of the Port of St. Bernard and specifically included language limiting its authority over a tenant owned facility to those "whose origin and destination is wholly within the continental United States, including coastal waters." The court held that, as the statutory language clearly gave exclusive authority over international cargo to the Port of New Orleans, it had authority over the project regardless of the mixed use of the facility. WCP is the only legal entity in this case with the authority to collect the fees at issue within its jurisdiction.

The law provides for intergovernmental agreements, as mentioned in *Hospital Service District Number 2,* 716 So.2d 168, as the sole vehicle for two political subdivisions to cooperate on projects that may benefit both while protecting and

22

respecting the authority and jurisdiction of both political entities like LCP and WCP. LCP's insistence that it alone is entitled to revenues generated from this port facility, including all wharfage, shipping, and channel user fees, located wholly within WCP's jurisdiction, no doubt left the trial court with no alternative but to transfer ownership of the land to WCP.[4]

Despite LCP's failure to seek an intergovernmental agreement with WCP, the majority attempts to ratify LCP's unilateral actions by asserting it was done with the support of the Cameron Parish Police Jury and WCP. The record, however, demonstrates that while Cameron Parish Police Jury's Administrator wrote a letter expressing support for the development and operation of an LNG plant in Cameron Parish, the letter was not followed by any resolution from the Parish or Port abandoning their respective authority over the site and channel activities within their jurisdiction. In fact, the record shows WCP was willing to discuss entering an intergovernmental agreement concerning the property but apparently LCP was not

---

[4] This insistence by LCP, and its complete lack of respect for the jurisdictional authority of WCP was made evident in this case. The defense argued that WCP is attempting to receive something for nothing. The record belies this assertion. WCP passed local bond measures of $3,500,000.00 to be spent on maintaining the channel in Cameron Parish.

At a board meeting on October 14, 2002, LCP board member (Mr. Langley), perhaps prophetically, read "The Flying V" which explains the scientific discovery of why geese fly in a "V"formation. According to this report, flocks of geese fly in "V" formation because that formation acts aerodynamically as a single wing distributing wind drag equally across all birds. According to the Cal Tech research, twenty-five geese flying in a "V" formation can travel seventy-five percent farther than one goose flying alone. As Mr. Langley's report puts it "From geese, we can learn that although we live in a society that promotes individualism and self-reliance, we function more effectively in a community. Like the geese, we were created by God to work together, serve together and encourage (and) support each other. When we cooperate and help each other to succeed, we not only accomplish much but we do it with less stress and difficulty." Perhaps that is exactly what the legislature had in mind when it provided statutory guidance for inter-governmental agreements. Such an agreement between LCP and WCP would have provided the only legitimate basis for LCP to operate within WCP's territorial jurisdiction. Unfortunately, LCP, chose to be the lone goose in hopes of having the ultimate reward all for itself. This exemplifies the precise danger of allowing neighboring political subdivisions like port districts, hospital districts, and school districts to cannibalize, destroy and eviscerate their neighbors for their own financial gain. The people of Cameron Parish deserve better.

23

interested.[5]

As the trial court correctly ruled, and as this court and our sister courts have ruled, title to this land belongs to the State (the public) and must be transferred to West Cameron as only it has the statutory authority to administer this property for the State and to conduct port, harbor, and terminal activities within Cameron Parish. This transfer of title to the people's property will not impede in anyway LCP's right or authority, as a subdivision of the State, to engage in dredging and spoil operations on the property–a servitude of use it had at the time it purchased the property, and a right the trial court's judgment does not deny it today.

---

[5]The record of proceedings before the West Cameron Port Harbor & Terminal District dated October 14, 2004 states the following:

> The board discussed the Sempra Project, the issuance of their permit and the future development of the Calcasieu Ship Channel. They did not want the permit to set the precedence over their authority. Mr. Romero, Mr. Savoie, and Mr. Wilkerson informed the board members on the outcome of the informal meeting between the Police Jury, the Lake Charles Port Harbor & Terminal District and the West Cameron Port Commission Group.

> On the motion of Mr. Hebert, seconded by Mr. Constance and carried the board agreed to have the same group to serve to negotiate with the Port of Lake Charles in reference to the Sempra Permit.