FOURNET, Justice.
 

 The State Bank Commissioner, through his special agent and the liquidator in charge of the affairs of the Canal Bank &■ Trust Company, in Liquidation, filed a tableau of distribution on June 21, 1945, proposing to pay to the depositors of the bank the final balance on the principal amount of their account on its books in full settlement thereof. Oppositions were filed to the homologation of this tableau by some of the depositors or their assignees on the ground that they are entitled, in addition to the full amount of their deposit, to legal interest on the unpaid balance thereof from the day the bank went into liquidation, May 20, 1933. Payments were made in accordance with the plan of distribution when the court approved the same with reservation of the right of the opponents, as well as of all other depositors and creditors who at that time had accounts standing in their respective names on the books of the liquidation “to claim that same (the payment made under the plan of distribution) is not ‘in full satisfaction and complete discharge’ of their respective present claims against” the bank. (Parenthesis ours.)
 

 Certain stockholders of the bank thereupon intervened joining the bank commissioner in his plan of distribution, claiming the depositors are not entitled to interest, and seeking to have the entire surplus of assets remaining after the payment of the balance of the principal amount due the depositors and creditors delivered to the stockholders. As the basis for their position the intervening stockholders contended (1) that the Canal Bank & Trust Company was placed in liquidation on May 20, 1933, as the result of the nation-wide bank crisis which was brought about by circumstances beyond the bank’s control and due to no fault on its part, consequently, that damages ex mora in the form of interest could not be awarded against it, such damages being payable only when the debtor is in default; (2) that Act 300 of 1910 authorizing the closing of banking institutions and the liquidation of their affairs by the state banking authority does not contemplate the payment of interest on deposits by liquidating banks, as evidence by the construction universally given this act by the banking department, the administrative office charged with the duty of enforcing the act, and by the attorneys of the banking department, as well
 
 *812
 
 as by the attdrney -general, the district courts, including the court having jurisdiction in this proceeding, the depositors and those acquiring through them in the transfer of the deposits, and by the opponents in this case; further, that such construction is within the policy of this court, as will be found from expressions in some of its decisions, namely, Daugherty v. Canal Bank & Trust Co., 180 La. 1003, 158 So. 366; Brock v. Citizens State Bank & Trust Co., 190 La. 572, 182 So. 679; and In re Interstate Trust & Banking Company, 204 La. 323, 15 So.2d 369; (3) that the plan whereby the Canal Bank was placed in liquidation and the new bank (The National Bank of Commerce) was organized for the express benefit of the opponents, to the detriment of the stockholders, with the payment of 35% of their (opponents’) deposits immediately, contemplated subsequent payments on the remainder of the frozen deposit would bear no interest and that the opponents by their agreement to this plan and by their action in accepting these subsequent payments on the principal in accordance with the banking commissioner’s plans of distribution, duly homologated by judgment of court, without any opposition, are at this time estopped to claim settlement on any other basis than that contemplated in the plan, particularly .since the stockholders, who purchased stock in reliance upon the action of the opponents and their acquiescence in the plan, will thereby be prejudiced; and, finally, that in any event (4) the depositors who accepted the principal amount of their claims in full (the $5, $10, and $15 depositors) and those who accepted installments on account of the principal as a designated percentage of the balance due them without protest or reservation, thereby released any claim they had to interest under the express provisions of Article 2925 of the Revised Civil Code and the jurisprudence thereunder.
 

 There was also an intervention filed by the Davenport Investment Corporation in which it claimed, as the assignee of the restricted deposit of the Deposit Guaranty Bank & Trust Company of Jackson, Mississippi, the right to interest amounting to $78,755.56 on this deposit, although the Davenport Investment Corporation had, previous to the filing of the account, transferred its rights in and to this deposit to another company.
 

 The trial judge rendered judgment dismissing the interventions of the stockholders and of the Davenport Investment Corporation and ordered the bank commissioner, through his special agent and liquidator in charge of the liquidation of the bank, “to pay to all ordinary demand and time depositors and creditors, in addition to the principal amount of their claims, legal interest thereon from the 20th day of May 1933 until paid * * * as funds are available,” before delivering any of the assets of the bank to the shareholders.
 
 *814
 
 'The intervenors are appealing from this judgment.
 

 We think the record establishes the following facts, which must be understood in order that the issues raised in this case may be properly evaluated and disposed of:
 

 For more than 100 years following its establishment, the Canal Bank & Trust Company of New Orleans, Louisiana, organized as a state bank under the laws of Louisiana and a member of the Federal Reserve System, functioned uninterruptedly until March 1, 1933, when the Governor of Louisiana, because of unsettled economic conditions and the acute banking difficulties existing throughout the entire nation, due largely to heavy and unwarranted withdrawals of gold and currency from banking institutions, by proclamation declared the best interest and welfare of the people of the state demanded that he name Thursday, March 2, Friday, March 3, and Saturday, March 4, holidays with the resultant suspension of all public enterprises, including banking, during that period. On the same day, by resolution approved by the Governor, the New Orleans Clearing House suspended the payment of demand obligations, in whole or in part, effective at 9:30 a. m. on Thursday, March 2. On that day, also by resolution (this time approved by the author of this opinion in his capacity as the then Lieutenant and Acting Governor), the New Orleans Clearing House Association lifted the absolute restriction placed on the payment of demand obligations in the previous resolution by permitting, effective at 10:00 a. m. on Friday, March 3, the withdrawal of 5% of all deposits as well as the checking against this amount and any deposits made subsequent thereto without reservation. As the result of this resolution, the Canal Bank & Trust Company, along with other banks in the city, opened for business on March 3 on this restricted basis. However, these banks were closed again the next day and the payment of demand obligations suspended by the issuance of another proclamation of the Governor making the holiday fixed in the proclamation of March 1 mandatory and, further, extending the holiday to also include Monday, March 6. The New Orleans Clearing House Association drafted another resolution in compliance with the mandatory requirements of this proclamation. The Federal Reserve Bank throughout the nation also declared holidays on these dates and during the early hours of Sunday, March S, the Canal Bank & Trust Company was advised by wire from the State Bank Commissioner that the bank was closed until further orders and that all books and assets and records of the bank as of Saturday, March 4, were to be kept intact. Under these conditions the Canal Bank & Trust Company, as well as all other banks throughout the state, remained closed from March 2 through March 6.
 

 On March 6, in order that all banks throughout the country might be placed on a uniform basis of restricted operation and adequate means for dealing with what was
 
 *816
 
 termed á "national emergency” by Congress and the President of the United States might be developed, the President, by proclamation, declared a national bank holiday by extending the holiday through Thursday, March 9, and the Governor of Louisiana and the New Orleans Clearing House Association took the necessary steps to assure compliance with this mandate of the President. On March 9, the President continued his proclamation of March 6 in full force and effect. The bank holiday was then extended in Louisiana by the Governor until such time as it was terminated by the President. However, on March 14, though the holiday throughout the rest of the nation was somewhat eased, the Governor extended it in Louisiana through Saturday, March 18. The President stated in his proclamation of March 6 that he took this action because it was in the
 
 "best interests of all bank depositors that a period of respite be provided with a view to preventing further hoarding of coin, bullion or currency or speculation in foreign exchange
 
 * * * .” (Italics ours.)
 

 While the banks of the nation thus remained closed, the President, on March 9, 1933, asked Congress to insure the reopening of the banks for the resumption of business by enacting appropriate legislation to give the executive branch of the government control over all banks
 
 for the protection of the depositors
 
 with authority to reopen banks ascertained to be in a sound condition as rapidly as possible and also with authority to reorganize and reopen such banks as were found to require reorganization to put them on a sound basis. Congress immediately responded to this request by passing legislation prohibiting the transaction of any banking functions by member banks of the Federal Reserve System (of which the Canal Bank was one) during the emergency period except under the regulations, limitations, and restrictions prescribed by the Secretary of the Treasury and approved by the President. As was pointed out by the President in a subsequent radio address,
 
 “the essential accomplishment of the new legislation is that it makes it possible for banks more readily to convert their assets into cash than was the case
 
 before." (Italics ours.)
 

 In an executive order issued on Friday, March 10, 1933, the President informed the nation that the Secretary of the Treasury was authorized and empowered to permit any bank a member of the Federal Reserve System to perform any or all of their usual banking functions
 
 under regulations drafted by him
 
 and that those banks desiring to avail themselves of this authorization should apply to the Secretary of the Treasury for a license to reopen, the President explaining further in a statement to the press on the following day that under this plan banks located in Federal Reserve bank cities would open for business again on Monday, March 13; those located in cities having active and recognized clearing houses would reopen on Tuesday, March 14
 
 *818
 
 (New Orleans banks came under this classification) ; and all those located elsewhere would reopen on Wednesday; further, that no implication was to be drawn from this plan of reopening that the banks opening on Monday were in any better position financially than those opening on Wednesday.
 

 In a radio address to the nation on the following day, Sunday, March 12, President Roosevelt explained the cause of the national economic crises and the necessity for all of these emergency measures in the following simple language:
 

 “First of all, let me state the simple fact that when you deposit money in a bank the bank does not put the money into a safe deposit vault. It invests your money in many different forms of credit — bonds, commercial paper, mortgages and many other kinds of loans. In other words, the bank puts your money to work to keep the wheels of industry and of agriculture turning around. A comparatively small part of the money you put into the bank is kept in-
 
 currency
 
 — an
 
 amount which in normal times is wholly sufficient to cover the cash needs of the average citizen.
 
 In other words, the total amount of all the currency in the country is only a small fraction of the total deposits in all of the banks.
 

 “What, then, happened during the last few days of February and the first few days of March? Because of undermined confidence on the part of the public, there was a general rush by a large portion of our population to turn bank deposits into currency or
 
 gold
 
 — a
 
 rush so great that the soundest banks could not get enoivgh currency to meet the demand. The reason for this was that on the spur of the moment it was, of course, impossible to sell perfectly sound assets of a bank and convert them into cash except at panic prices far below their real value.
 

 “By the afternoon of March 3 scarcely a bank in the country was open to do business. Proclamations temporarily closing them in whole or in part had been issued by the Governors in almost all the States.
 

 “It was then that I issued the proclamation providing for the nation-wide bank holiday, and
 
 this was the first step,
 
 in the Government’s reconstruction of our financial and economic fabric.” (Italics are all ours.)
 

 The record shows that immediately upon release of the President’s executive order of March 10 advising all member banks of the Federal Reserve System desiring to reopen to apply to the Secretary of the Treasury through the nearest Federal Reserve Bank for a license to do so, the Chairman of the Board of the Canal Bank & Trust Company, Mr. A. D. Geoghegan, wired such application to the Governor of - the Federal Reserve Bank of Atlanta, Georgia, with notification thereof by wire to the Secretary of the Treasury and the Acting Comptroller of the Currency in Washington, D. C. This was followed up the next
 
 *820
 
 day, March 11, by wires to the Governor and the Federal Reserve Agent- of the Federal Reserve Bank of Atlanta, Georgia, requesting their assistance and suggestions to the end that such license might be secured.
 
 There is no official document in the record to show upon what grounds the Secretary of the Treasury refused to issue this license but there is in the record a copy of the statement to the press made by Mr. Geoghegan
 
 on March 26 upon his return from 3 two-weelc conference in Washington wherein he said: “The last examination of the Bank by Federal authorities showed the institution to be more than solvent, but the Comptroller of the Currency was unwilling to grant us a license to resume business on an unrestricted basis
 
 due to the bank’s sizable investment in bank biálding, real
 
 estate,
 
 and other assets ultimately good but of a slow nature.”
 
 (Italics ours.)
 

 In this same statement Mr. Geoghegan said he and Mr. Lucas, the President of the Canal Bank & Trust Company, had secured two definite commitments from the Reconstruction Finance Corporation while in Washington and these were (1) that if a new national bank were organized in New Orleans with a capital of $3,000,000, the corporation would subscribe to half of the capital through the purchase of preferred stock and (2) that if this new national bank were organized the corporation would lend the Canal Bank & Trust Company a sufficient amount to make an initial and immediate distribution of approximately 30% to the bank’s depositors in addition, to the 5% already made available to- them and
 
 the depositors were asked to subscribe-to the capital in the new bank to be formed from this 30% made available to them by the Reconstruction Finance Corporation.
 

 Thus it was that when the Canal Bank & Trust Company did reopen its doors for business at the end of the national and state bank holiday on March 20, 1933, with the permission of the State Bank Commissioner, it was functioning on a restricted basis. It continued to operate in this manner until the plans were completed for the organization of the new national bank. Many of the depositors did • acquire stock in this new bank in accordance with the plea of the bank’s officials, including some-of the depositors who are the opponents, in this case. When the Canal Bank & Trust Company closed its doors on Saturday, May 20, 1933, it went into liquidation and' the new bank, the National Bank of Commerce, on Monday morning, May 22,, opened its doors in the same place and with substantially the same officials and personnel.
 

 The Canal Bank & Trust Company was placed in liquidation under the provisions, of Act 300 of 1910, giving the state banking department authority to close banking institutions and to liquidate their affairs, upon the petition of the State Bank Commissioner filed on May 20, 1933,
 
 after the bank in a resolution adopted by its board of di
 
 
 *822
 

 rectors requested him to do so. This action was acquiesced in and approved by the Governor through the attorney general, by the Mayor through the city attorney,
 
 by a group of disinterested prominent citizens of the city, 'by the Depositors’ Committee of the Canal Bank & Trust Company (in which were included many, or most, of the opponents here), and by the New Orleans Depositors Association, a group of depositors from all of the closed banks in the city. All of these persons and organizations urged that this liquidation and the parelleling reorganization of the national bank be expedited with all possible speed
 
 in the interest of the depositors and the general public because of the emergency existing as the result of the serious crisis existing in the financial and commercial .affairs of the community.
 
 The first order in the liquidation, signed by the judge before whom the liquidation took place on the same day on which the petition for liquidation was filed, recognized the existence -of the public emergency. By this order the judge approved the distribution to the depositors of 35% of their balances on deposit as of the close of business on March 1, 1933, or of 30% in the case of those depositors who had already withdrawn the 5% allowed under the bank’s restricted ■operations. This amount was actually distributed two days later.
 

 On December 15, 1937, all frozen deposits amounting to $5 or less were paid in full and on the same day the bank distributed to the other depositors 25% of the remaining balances after deduction of the dividend authorized for distribution on May 20, 1933. On November 12, 1940, there was a second distribution, this time an amount equivalent to 20% of the balance then remaining. On August 10, 1942, all frozen deposits then amounting to $10 or less were paid and on the same day there was distributed among the remaining depositors the next dividend, which amounted to 25% of the remaining balance. The fifth distribution was made on December 4, 1944, when all of the frozen deposits then amounting to $15 or less (in all amounting to approximately 8,165 accounts) were paid in full and a dividend of 60% of the remaining balance was distributed to the other depositors. This meant that upon the distribution of this dividend all depositors who had had $51.28 or under on deposit in the bank at the time the bank holiday began had been paid in full, that the number of accounts had been reduced from about 137,-577 to approximately 31,500, and that the amount remaining due and unpaid these 31,500 depositors constituted only 11.70% of the original amount deposited to their credit as of March 1, 1933.
 

 The tableaus setting forth the proposed distributions of these amounts were filed in the lower court and before payments were made thereunder, they were duly advertised and homologated by judgment of court. Upon payment receipts were exacted of each creditor. In the case of
 
 *824
 
 those receiving full payment of their claim, these receipts read that such payment was “In full satisfaction and complete discharge” of their claims against the bank. In the case of those receiving only partial payments on account of the deposits, these receipts provided that such receipts were “in full payment of dividend of (the percentage paid) on the unpaid restricted deposit or claim.”
 

 The generally accepted rule of law, as stated in American Jurisprudence, is “that interest on general claims against an insolvent hank will not he computed for the period after the hank passes into the hands of a receiver or liquidator where the assets of the bank are not sufficient to pay the principal of all the debts. If, however, the assets of the insolvent bank do in fact turn out to be sufficient to meet all demands and leave a surplus over, interest on all claims will, in the absence of statutory prohibition, be allowed out of the surplus to the creditors for the period during which the insolvent bank has been in the hands of the receiver or liquidator.” .Vol. 7, page 536, Section 744.
 

 Such interest is either conventional, in accordance with the contract or agreement, or legal, as fixed by law (Article 1936 of the Revised Civil Code), the former being due without demand from the time stipulated in the contract for its commencement until the principal is paid (Article 1937), all other debts bearing interest at the rate of 5%' per annum from the time they became due. Article 1938. See, also, Article 554 of the Code of Practice.
 

 It is declared in the Revised Civil Code that “The damages due for delay in the performance of an obligation to pay money are called interest” (Article 1935) and that
 
 a depositary "owes no interest for the money deposited in his hands, except from the day on which he became a defaulter by delaying to restore it.”
 
 Article 2948. The latter article is found in Section 3 of Chapter 2 of Title XIII of the code dealing specifically with the obligations of the depositary and in this same section it is further provided that “The depositary is bound to use the same diligence in preserving the deposit that he uses in preserving his own property.” Article 2937. This provision is to be rigorously enforced (Article 2938), but “The depositary is not answerable, in any case, for accidents produced by
 
 overpowering force,
 
 unless he has delayed improperly to restore the deposit.” Article 2939. According to the editors of the Louisiana Legal Archives, the words “delayed improperly” in this article should have been translated to read “been put in default for failure.” (Italics ours.)
 

 The Revised Civil Code also provides in the fourth section of Chapter 3 of Title IV, under the heading “Of the Damages Resulting From the Inexecution of Obligations” that the party who violates a contract “is liable, as one of the incidents of his obligations, to the payment of the dam
 
 *826
 
 ages, which the other party has sustained by his default.” Article 1930. “When the breach has been passive only, damages are due from the time that the debtor has been put in default, * * '* subject to the following exceptions and modifications: * * * 2. Where, by a
 
 fortuitous event
 
 or
 
 irresistible
 
 force, the debtor is hindered from giving or doing what he has contracted to give or do or is from the same causes compelled to do what the contract bound him not to do, no damages can be recovered for the inexecution 'of the contract.” Article 1933.
 

 We have little doubt that but for the economic crises existing at the time the bank closed the Canal Bank & Trust Company would have continued to operate and function as it normally did indefinitely, as contended by the intervenors. We think, too, that the bank’s accumulation of so-called slow assets (which, according to Mr. Geoghegan, the then chairman of the board of directors of the bank, was given as the reason for the Comptroller’s refusal to grant the bank a license to reopen) was due, as explained by the President as the cause for the crises in his radio address of March 12, 1933, to the undermined confidence of the public and the resulting withdrawal of such an unprecedented amount of currency and gold that sound banks, or those considered sound under ordinary circumstances, could not secure sufficient currency to meet their current demands because they could not sell perfectly sound assets except at prices far below their real value on account of the panic. And while the Canal Bank & Trust Company may have been technically solvent in the sense that its assets at a fair value may have been sufficient to meet its obligations, these assets could not be readily reduced to cash in the event of a continued run and we think the government had a right, under its police power and in the interest of the depositors and the general economic welfare of the country, to enact a law regulating the affairs of such banks and to decline, if necessary, to allow any banks except those considered sound to reopen. Such action by Congress and the President did not, in our opinion, constitute such an irresistible force or fortuitous event as is contemplated by Article 1933 of the Revised Civil Code or an overpowering force within the intendment of Article 2939.
 

 Being unable to obtain a license to reopen from the Comptroller, the Canal Bank, of necessity, found it “inexpedient” to continue to do business on a restricted basis and was faced with the problem of securing sufficient additional funds from the stockholders, either by voluntary assessment or otherwise, to relieve the condition, or of having the bank closed and liquidated by the bank commissioner under the provisions of Act 300 -of 1910. Of course, when it chose to do the latter, this did not have the effect of changing the status of the rights of the depositors and other creditors of the bank. Nor did it
 
 *828
 
 change the general law affecting their rights.
 

 We are unable to agree with the contention that the opponents and other creditors of the bank are estopped to claim interest on the frozen deposit because under the plan whereby the Canal Bank & Trust Company was liquidated and' the National Bank of Commerce was organized they agreed no interest would be paid them on the portion of their claims against the bank that remained frozen after the payment to them of 30% of their deposit under such plan, for there is no specific agreement to this effect in the ■ record and there are no facts in the case that would warrant such a conclusion.
 

 Under the jurisprudence of this state estoppels are not favored and should not be maintained except in cases that clearly show the one invoking the principle has been led to change his position to his injury by the conduct and action of the one against whom the plea is urged. Castleman v. Smith, 148 La. 233, 86 So. 778; Louisiana Oil Refining Corporation v. Williams, 170 La. 218, 127 So. 606; and In re Clover Ridge Planting & Manufacturing Co., Inc., 178 La. 302, 151 So. 212. Consequently, whatever action was taken in carrying out the plan of liquidation ■ and reorganization, the mere failure of the bank’s creditors to assert their right to interest during the liquidation cannot form the basis of an estoppel. (The effect of the acceptance of the principal by the creditors without any reservation as to interest in accordance with plans of distribution of the bank commissioner duly homologated by judgment of court will be discussed later.)
 

 While it is the generally accepted rule that the contemporaneous construction given a statute by those charged with its execution is entitled to great weight and should not be disregarded except for cogent reasons, this rule is not controlling, particularly if such construction is erroneous. State v. Standard Oil Co. of Louisiana, 188 La. 978, 178 So. 601; State v. J. Watts Kearny & Sons, 181 La. 554, 160 So. 77; 25 R.C.L. 1043, Sections 273 and 274; and 50 Am.Jur. 309, Section 319. In none of the cases relied on by the intervenors in support of this rule of construction was such an issue raised or passed upon. The expressions found in the cases of Brock v. Citizens State Bank & Trust Company and In re Interstate Trust and Banking Company, supra, are mere dicta and the suggestion that because in the Daugherty case . (where the plaintiff sought to be recognized as a preferred creditor for the amount of her deposit with interest) this court rendered judgment recognizing her as an ordinary creditor for the principal amount without interest “it cannot consistently or legally render a different judgment as to other creditors,” is untenable. The answer to this is that the issue presented here was not squarely before the court in the Daugherty case. At that time the bank was in the early stages of the process of
 
 *830
 
 liquidation and a review of the record in the Daugherty case will show that it was not contended in the application for rehearing that this court had erred in not allowing the plaintiff’s claim for interest. In all probability the reason for the plaintiff’s failure to ask for a correction in the decree so that her right to interest would be recognized was due to the fact that she, like the majority (if not all) of the other creditors of the bank at that time had little faith in the ultimate ability of the bank to pay their claims in full, much less that its assets would eventually be sufficient to pay interest. We might add that but for the development of oil and gas on and around property belonging to the bank and the marked improvement in the general economic conditions throughout the country just prior to and during the war, increasing greatly the value of real estate, we doubt that enough cash would have been realized out of the assets of the bank to pay these creditors in full after all of the costs of the liquidation were deducted.
 

 In our opinion, when the legislature adopted Act 300 of 1910 authorizing the bank commissioner under certain conditions to take possession of banks and to liquidate their affairs, without detailing the exact procedure to be followed and without mentioning the rights of the creditors of such institutions to interest, it was its intention that such statute should be harmonized with the then existing law and policy of this state and that the liquidation of the bank’s affairs would, therefore, be controlled by the law already in force with respect to interest and with respect to the procedure followed in ordinary judicial liquidations.
 

 In the instant case the bank commissioner in the course of the liquidation, and we think within the intendment of the act, treked the procedure generally followed in judicial liquidations and only made distributions of the bank’s assets to its creditors upon judgment of court homologating the tableau or plan of distribution filed with the clerk by him and duly advertised. Examining these judgments of homologation we find they not only authorized the distribution of a definite sum of money to each creditor, but that such amount was designated as a fixed percentage of the principal of the frozen deposit, or as the full amount thereof, as reflected on the bank’s books, no provision being made for the payment of interest and “It has been repeatedly held by this court since its decision in the case of Dussuau’s Syndics v. Bredeaux, 4 Mart., O.S., 450, in 1816, and has that long been the settled law of this state, that judgments homologating accounts are final and have the authority of the thing adjudged.” In re Phoenix Building & Homestead Association, 203 La. 565, 14 So.2d 447, 449. The judgments approving such accounts become “res judicata, and the issue so determined cannot be reopened by way of opposition to a subsequent account rendered by the receiver.”
 
 *832
 
 Woodward, Wight & Co. v. National Box Co., 168 La. 701, 123 So. 296, 298. See, also, the authorities therein cited.
 

 Opponents, however, relying on the rule of law generally accepted in cases, involving bank liquidations in other jurisdictions to the effect that since their right to interest could only arise when all of the creditors are paid in full and it becomes apparent there will be a sufficient surplus to meet such payments, contend their acceptance of the principal did not constitute a waiver of their right to thereafter claim interest once it became apparent there were sufficient remaining assets to pay such interest.
 

 While rulings on similar problems in other states are entitled to consideration and may be resorted to in aid of the construction of a statute, the authorities of other jurisdictions on
 
 the
 
 subject
 
 matter
 
 are not followed or given consideration if they are not in harmony with the interpreting state’s procedural and substantive laws. 25 R.C.L. 1073, Section 295; 59 C.J. 1065, Sections 627 and 628; 50 Am.Jur. 315. As expressed in the latter authority: “It is a general íule of law that, where a question of statutory construction is one of novel impression, it is proper to resort to decisions of courts of other states construing statutory language which is identical or of similar import. * * * However, it is clear that such decisions of foreign courts are not conclusive, and will not be followed if they are fundamentally inconsistent with the local law.”
 

 We note that a basis for a great many of the decisions of the federal courts in cases involving national banks and of state courts with reference to state banks is that the mere allowance of a claim by the officer in charge of the liquidation has the “efficacy of a judgment” and that it bears interest as such; further, that the distribution by the liquidator is a mere dividend to be applied to the whole. Other states base their decisions on grounds of equity.
 

 Our law is to the contrary. The allowance of claims by the State Bank Commissioner does not have the efficacy of a judgment in this state and our courts are not authorized to resort to equity where there is -positive law.
 

 In the performance of his duty in distributing the available cash assets of the bank
 
 to its
 
 creditors, the bank commissioner must, as in judicial liquidations, obtain a judgment of court homologating the account and this judgment is only obtained after the commissioner has filed a tableau of distribution with the clerk of court and it has been duly advertised so that all persons having an interest therein ma'y oppose it. It is only in the event of no opposition or after an opposition that is filed has been disposed of by the court that the tableau is homologated by judgment of the court and this judgment, as above pointed out, settles once and for all the matters that are therein disposed of and they can never again be inquired into. Woodward, Wight & Co., Ltd. v. National Box Co., Inc.; In re Phoe
 
 *834
 
 nix Building & Homestead Association, supra. See, also, the authorities cited in these 'cases.
 

 Another of the well settled rules of law in this state is that interest is never due on a judgment unless provision is made in the judgment for the payment of the interest (Article 157 of the Code of Practice) excepting, of course, those judgments rendered in tort actions, which are specifically provided for by statute. See Act 206 of 1916.
 

 The argument of the opponents’ counsel that so long as the bank was in the process of liquidation and until it was apparent that there were sufficient assets to pay, in addition to the principal amount of the deposits, interest thereon, they were without right to demand or enforce payment of interest and that they should not, therefore, be penalized for having failed to do a useless and vain thing, is, in the light of the jurisprudence of this court with respect to the finality of the thing adjudged, without force, and comparable to the argument of the intervenors that because this court in the Daugherty case recognized Mrs. Daugherty’s claim without interest, it would be illogical and unfair to now grant the opponents interest on their claims. While it is true the opponents were without right to enforce payment of interest during the liquidation, they, like the plaintiff in the Daugherty case, should not have allowed the judgment affecting their rights to become final against them without raising the question of the right'to interest specifically by filing a motion for a rehearing on this point in the Daugherty case and by opposition to the account filed by the liquidator in the case of the opponents here.
 

 In any event, under'the express provisions of Article 2925 of the Revised Civil Code, one who accepts the payment of the principal without reservation as to the interest due thereon, thereby releases any interest that may be due. Faurie v. Pitot, 2 Mart., O.S. 83; Saul v. His Creditors, 7 Mart., N.S., 425; Harty v. Harty, 2 La. 518; Succession of Mann, 4 La.Ann. 28; Motor Liens v. Motion Picture Advertising Service, 164 La. 440, 114 So. 89; Brock v. Citizens State Bank & Trust Co., 190 La. 572, 182 So. 679; and Grennon v. New Orleans Public Service, Inc., 17 La.App. 700, 136 So. 309, 313.
 

 In a very able opinion written by the. Hon. Charles E. Dunbar, acting as judge ad hoc for the Court of Appeal for the Parish of Orleans, in the Grennon case, where the effect and scope of Article 2925 is very thoroughly discussed and treated, it is observed:
 

 “ * * * the common-law. courts universally recognize the right to recover interest after the payment of the principal debt, where the interest was expressly provided for by the terms of the contract, because under such circumstances the interest
 
 *836
 
 becomes an integral part of the debt. * * * it seems to be equally well recognized at common law that if intérest is not expressly stipulated for in a contract, but on the contrary is allowed merely by way of damages for the wrongful detention of money, or for neglect to pay promptly, it is a mere incident of the debt, which fails when the debt itself is extinguished, and in such a case, if the debt is paid, there can be no recovery afterward for the interest which might have been collected. * * * Where, however, the obligation is one that by statute bears interest * * * some common-law courts regard this as an equivalent of contractual interest, and therefore allow a recovery, even though the principal sum has been paid; while other courts regard it in the nature of damages and refuse recovery after the payment of the principal sum.”
 

 Then pointing out that it was unnecessary to decide whether the interest given by Act 206 of 1916 should be treated in the same way as contractual interest is treated in the common law or whether it should be analogized to interest in the day of damag'es because “Article 2925 of the Louisiana Revised Civil Code seems to establish in Louisiana a general and comprehensive rule with reference to the waiver of interest, and the language of this article, which is unqualified, indicates that the distinction established by the common-law cases * * is not recognized or applied in Louisiana,” the court concluded this article establishes a legal or conclusive presumption of law which under the provisions of Article 2287 of the Revised Civil Code dispenses with all other proof in favor of the person for whom it exists. Article 2925 of the code reads as follows: “The release of the principal, without any reserve as to interest, raises the presumption that it' also has been paid, and operates a release of it.”
 

 Clearly, therefore, the opponents here and the other creditors of the bank are not entitled to claim interest on any part of their principal claim against the bank except that portion incorporated in the last tableau and plan of distribution filed on June 21, 1945, and amounting to 11.70% of the original amount of the deposit at the time the bank was closed.
 

 The final matter that must be disposed of in this case is the claim of the Davenport Investment Corporation. ' We think the judgment of the lower court dismissing this claim is correct. Since this corporation’s right to interest is based upon its acquisition of the original frozen deposits from the original depositor (the corporation’s assignee), it goes without saying that when this company assigned these same frozen deposits to another company it also transferred whatever right it had to claim interest on the deposits, for interest is a mere incident to the principal debt. The authorities cited by the attorney for this intervenor are neither in point nor in anywise pertinent.
 

 
 *838
 
 For the reasons assigned, the judgment of the lower court in so far -as it orders the State Bank Commissioner to pay interest on that portion of the principal amount paid to the depositors and creditors of the Canal Bank & Trust Company, in Liquidation, in pursuance of judgments of the court of December IS, 1937, November 12, 1940, August 10, 1942, and December 4, 1944, homologating the tableaus filed by the State Bank Commissioner in this liquidation proceeding is annulled and set aside. In all other respects the judgment is affirmed.