**ENGLISH TURN PROPERTY OWNER'S ASSOCIATION, INC.**

v.

**Karen Sovinsky Short, Wife of/and Donald J. SHORT**

**English Turn Property Owner's Association, Inc.**

v.

**Karen Sovinsky Short, Wife of/and Donald J. Short**

**NO. 2016–CA–0460, NO. 2016–CA–0532**

Court of Appeal of Louisiana, Fourth Circuit.

NOVEMBER 30, 2016

Rehearing Denied December 14, 2016

Jacob Kansas, LAW OFFICE OF JA-COB KANSAS, 1801 Carol Sue Avenue, Gretna, LA 70054, COUNSEL FOR PLAINTIFF/APPELLANT

Michael R. Delesdernier, ATTORNEY AT LAW, 2728 Athania Parkway, Metairie, LA 70002, COUNSEL FOR DEFENDANT/APPELLEE/CROSS APPELLANTS

(Court composed of Chief Judge James F. McKay, III, Judge Daniel L. Dysart, Judge Rosemary Ledet)

Judge Daniel L. Dysart

This is a consolidated appeal of a judgment ordering defendants-appellants, Donald Short and his wife, Karen Sovensky Short (the "Shorts"), to pay $14,190.00 to the English Turn Property Owner's Association ("the ETPOA") in outstanding homeowner association fees and the costs incurred in maintaining the lawn of the Shorts' property, a vacant lot. The judgment also awarded late charges/penalties, legal interest and court costs. Both the ETPOA and the Shorts have appealed this judgment, which we amend and, as amended, affirm.

**FACTS AND PROCEDURAL HISTORY**

On October 15, 1998, the Shorts purchased a lot located at 23 Cypress Point in New Orleans, Louisiana, from the English Turn Limited Partnership. The Cash Sale documents reflect that the sale was subject to certain conditions, including "Covenants, Conditions and Restrictions" recorded in the mortgage records. A little over a year later, on December 28, 1999, the Shorts purchased the lot adjacent to theirs, located at 25 Cypress Point. The Credit Sale documents reflect that this sale was subject to the same covenants, conditions and restrictions as the initial sale.

The Shorts built a home on the lot located at 23 Cypress Point. The adjacent lot, however, remained vacant. The Shorts sold their home on January 10, 2006 and moved to North Carolina; however, they retained ownership of the vacant lot at 25 Cypress Point.

On March 12, 2013, the ETPOA filed this suit against the Shorts, alleging that they failed to pay assessments from July 1, 2009 through January 1, 2013, and failed to pay grass cutting assessments for the years 2008–2012, all of which totaled $11,649.59. The ETPOA also sought late charges of 10% for each unpaid assessment and interest of 1.5% per month on the total indebtedness and attorney's fees. Its Petition stated that an Affidavit of Privilege had been filed in the mortgage records for Orleans Parish and sought recognition of the lien by the trial court.

After the matter was tried on July 9, 2015, the trial court rendered judgment on September 23, 2015 in favor of the ETPOA. The judgment and incorporated reasons noted that "[t]he terms of the homeowner's association are clear and unambiguous and no homeowner has ever had assessments waived." The trial court concluded that the Shorts had been "properly assessed" and it rendered judgment in the amount of $19,000.62, representing the unpaid annual assessments and the grass cutting fees. The judgment also awarded reasonable attorney's fees of $8,000.[1]

Following the rendition of the judgment, the Shorts and the ETPOA filed motions for new trial. The ETPOA's mo-

---

1. While the trial court agreed with counsel for the ETPOA that attorney's fees of 35% was not unreasonable, the trial court "capped" the fees at $8,000.

tion raised issues concerning the trial court's failure to award certain items of damages (including grass cutting fees, late charges, interest and court costs and its capping of attorney's fees) as well as the trial court's failure to state the date through which assessments and late charges would be calculated and its failure to recognize the ETPOA's lien. The Shorts' motion raised the issue (although it was raised at trial) of the ETPOA's Board of Directors' financial interest in the assessments. After a hearing on both new trial motions, held on July 9, 2015, the trial court issued an amended judgment dated February 26, 2016.[2] The amended judgment, also in the ETPOA's favor, provided as follows:

- $14,190 in past due assessments, through and including January 2015;

- $3,919 in grass cutting fees through December 31, 2105; [3]

- $1,810.00 in late charges and/or penalties;

- $6,791.91 representing attorney's fees of 35% of the property assessment, grass cutting fees and penalties;

- Legal interest from the date of judicial demand; and

- Court costs including the cost to preserve the lien and privilege.

The judgment also stated that "the Court recognizes a lien and privilege by the plaintiff against #25 Cypress Point Lane ... in accordance and consistent with [4]this judgment." It is from this judgment that both the ETPOA and the Shorts have appealed.

**2.** The amended judgment was issued after both a hearing on the motion for new trial, at which time, the trial court postponed ruling, and a status conference at which the issues were again discussed.

## DISCUSSION

### Standard of review

■ It is well-settled that our review of the factual findings in this case are "governed by the manifest error-clearly wrong standard." Lakewood Estates Homeowner's Ass'n, Inc. v. Markle, 02–1864, p. 4 (La.App. 4 Cir. 4/30/03), 847 So.2d 633, 637. "The two-part test for the appellate review of a factual finding is: 1) whether there is a reasonable factual basis in the record for the finding of the trial court, and 2) whether the record further establishes that the finding is not manifestly erroneous." Id. With that standard in mind, we turn to the issues presented by this case.

### Annual assessments

Because the issue of the assessments is at the crux of this case, we address the issues associated with the assessments first.

■ As their first assignment of error, the Shorts maintain that the trial court erred in allowing the ETPOA to verbally amend its petition at the time of trial to incorporate those unpaid assessments that accrued after it filed its petition. They argue that the original petition only sought "the amounts claimed to be owed from 2010 to 2013." This assignment of error has no merit.

First, a review of the trial transcript does not reflect any such verbal motion to amend the petition. While there was some discussion by the parties as to [5]assessments accrued after 2013, counsel for the ETPOA never moved to amend the petition. To the contrary, counsel for the

**3.** The Shorts do not dispute the amount awarded for unpaid grass cutting fees.

Shorts objected to testimony regarding those assessments and suggested that an amendment to the petition was necessary. The trial court overruled the objection and allowed the testimony.

A plain reading of the original petition indicates that the ETPOA did not limit its demand for assessments to those which were owed at the time it filed its petition. Paragraph VII of the petition expressly states:

> Plaintiff is entitled to a judgment for not only the association fees, and grass cutting charges which have accrued to date, but also for the unpaid fees and charges, and grass cutting charges accruing after the filing of this petition and until the judgment is rendered.

It is clear that the ETPOA sought to recover all unpaid association fees, both those which were owed at the time it filed its petition and those which became due after that time. We find no error in the trial court's overruling counsel for the Shorts' objection.

■ We now turn to the Shorts' argument that the trial court erred in its determination that they owed association fees in the amount determined by the ETPOA. The Shorts do not dispute that they owe the assessments but take issue with the amount that they owe. They maintain that the ETPOA's annual assessments are contrary to their "laws and regulations." [4] In this regard, the Shorts argue that the ETPOA wrongfully assessed the vacant lots at the same rate as lots with improvements (houses). Their position is that, under the covenants, there is a difference between a "lot" and a "dwelling" in that a "dwelling" includes both a lot and a home (dwelling). Thus, they maintain that the owner of a dwelling should pay an assessment for the lot and a separate assessment for the dwelling, which would mean that the owners of homes would pay twice the assessment that the owners of vacant lots would pay.

The Shorts make several other arguments as to the assessments, including the following: (1) that the assessments as provided in the covenants are ambiguous and, therefore, should be interpreted against the ETPOA; (2) that an interpretation of the covenants in a manner by which vacant lot owners and homeowners are assessed at the same rate is "unfair, [and] will lead to an absurd consequence, and a violation of corporate law"; and (3) the ETPOA's Board of Directors unlawfully engaged in self-dealing in violation of La. R.S. 12:84 because they all "own both a Lot and a Dwelling" and, as such, have a financial interest in assessing the lot owners the same as the homeowners.[5] We disagree and find that the unambiguous terms of the covenants require that all owners of property in English Turn Subdivision, whether they own vacant lots or homes, pay an annual assessment in an equal amount.

---

4. The contractual agreements between the property owners of English Turn and the ETPOA's consist of the following documents: Declaration of Covenants. Conditions, and Restrictions for English Turn Subdivision; Articles of Incorporation of English Turn Property Owners Association Inc.; and By-Laws of English Turn Property Owners Association, dated September 1991. We refer to these documents herein sometimes collectively as the "covenants."

5. While the Shorts indicate that all members of the Board of Directors are homeowners and none are vacant lot owners, the record is devoid of any information as to who the Directors are and whether each owns a home or a vacant lot, although we note that Mr. Gauchet testified that "as far as [he] know[s]," the directors all have houses on their lots.

Assessments are governed by Article IX of the Declaration of Covenants, Conditions and Restrictions, incorporated by reference in the Cash Sale between the Shorts and the English Turn Limited Partnership. Section 9.02 provides, in pertinent part, that "[e]ach owner of a Lot or Dwelling by acceptance of a deed or other conveyance thereof, whether or not it shall be so expressed in such deed or conveyance, is deemed to covenant and agree to pay the Association: (a) annual assessments, such assessments to be established and collected in Section 9.03." That section provides:

9.03 Computation of Annual Assessments. It shall be the duty of the Board at least thirty (30) days prior to the Association's annual meeting to prepare a budget covering the estimated Common Expenses during the coming year... The Board shall cause the budget and the proposed total of the annual assessments to be levied against Lots and Dwellings for the following year to be delivered to each owner at least fifteen (15) days prior to such meeting. *The total annual assessments shall be divided among the Lots and Dwellings equally, so that each Lot and Dwelling shall be subject to equal annual assessments.* Upon the addition of the Additional Property or any portion thereof to the Development, assessments shall continue to be equal and the Lots and Dwellings being added to the Development shall thenceforth pay assessments which are equal to those imposed upon Lots and Dwellings previously in the Development. In such event, the Association's budget shall be accordingly revised by the Board, without the necessity of approval by the Owners, to include Common Expenses and assessments related to such additional Lots and Dwellings... (Emphasis added).

In Article I, the covenants specifically define the terms "Lot" and "Dwelling" as follows:

1.01 Definitions. When used in this Declaration, unless the context shall prohibit or otherwise require, the following words [] shall have all the following meanings and all definitions shall be applicable to the singular and plural forms of such terms:

* * * * *

(p) "Dwelling", with an initial capital letter, shall mean and refer to any improved property intended for use as a single-family detached dwelling or as a townhouse, condominium unit, or patio or cluster home, whether detached or attached, located within the Development.

* * * * *

(u) "Lot" shall mean and refer to any unimproved portion of the Property (a subdivided lot of record) upon which it is intended that a Dwelling shall be constructed. A parcel of land shall be deemed unimproved and thus considered to be a Lot, rather than a Dwelling, until the improvements constructed thereon are sufficiently complete to reasonably permit habitation thereof. Upon such completion, such parcel and the improvements thereof shall collectively be considered to be a Dwelling for purposes of this Declaration.

While the Shorts maintain that the terms "lot" and "dwelling" are ambiguous, we find the language of the covenants to be explicit and precise. It is abundantly clear that a "lot" is an unimproved property until, after sufficient improvements have been made, it becomes a "Dwelling;" the property is thereafter considered a "Dwelling," rather than a "lot." We further find that the covenants unambiguously and explicitly require that the annual assess-

ments be divided equally so that each owner of an "unimproved... subdivided lot of record" pays the same amount as the owner of a Dwelling.

 Our finding is consistent with our jurisprudence regarding the interpretation of contracts.[6] It is a well-settled rule that, when the words of a contract are clear, unambiguous, and lead to no absurd consequences, the court need not look beyond the contract language to determine the parties' true intent." *Landis Const. Co. v. St. Bernard Par.*, 14–0096, p. 5 (La.App. 4 Cir. 10/22/14), 151 So.3d 959, 962, *writ denied*, 2014–2451 (La. 2/13/15), 159 So.3d 467. Such is the case with the language of the covenants in this case, and we find that the trial court correctly found that the

Shorts owed the full amount of the unpaid assessments.

The record reflects that the assessments varied slightly per year (from $1,230 in 2009 to $1,350 in 2014 and 2015). The record reflects that the Shorts paid one assessment in 2009 of $1,170 ($60 short of the total assessment of $1,230). They paid no assessments after that date. Accordingly, we affirm the trial court's judgment of past due assessments in the amount of $14,190.[7]

 We do not find that the Shorts proved a violation of corporate laws or a specific violation of former La. R.S. 12:84 (which was repealed, effective January 1, 2015).[8] The Shorts rely on the United

---

6. The assessments at issue are considered building restrictions under La. R.S. 9:1141.5 B, which states that "building restrictions may include the imposition of an affirmative duty, including the affirmative duty to pay monthly or periodic dues or fees, or assessments for a particular expense or capital improvement, that are reasonable for the maintenance, improvement, or safety, or any combination thereof, of the planned community." As the First Circuit noted, "[i]n the case of buildings restrictions imposed on a subdivision, the restrictions may be likened to a contract among the property owners and the developer." *Bordelon v. Homeowners Ass'n of Lake Ramsey, Inc.*, 04–1115, p. 8 (La.App. 1 Cir. 5/6/05), 916 So.2d 179, 183; *see also, Country Club of Louisiana Prop. Owners Ass'n, Inc. v. Dornier*, 96–0898 (La. App. 1 Cir. 2/14/97), 691 So.2d 142, 147 ("[a]part from the rule of strict interpretation, documents establishing building restrictions are subject to interpretation and enforcement as are contracts").

7. Keith Gauchet, the property manager for the ETPOA since 2005, testified that assessments were due on January 1 and July 1 of each year. According to Mr. Gauchet, the Shorts' balance was $50 in July, 2009; however, given that they paid $1,170, the balance for the assessment due on July 1, 2009 was $60, rather than $50. The trial court's award includes the $60 balance rather than the $50 balance as testified to by Mr. Gauchet.

8. That statute read as follows:

A. No contract or transaction between a corporation and one or more of its directors or officers, or between a corporation and any other business, nonprofit or foreign corporation, partnership, or other organization in which one or more of its directors or officers are directors or officers or have a financial interest, shall be void or voidable solely for this reason, or solely because the common or interested director or officer was present at or participated in the meeting of the board or committee thereof which authorized the contract or transaction, or solely because his or their votes were counted for such purpose, if: (1) The material facts as to his interest and as to the contract or transaction were disclosed or known to the board of directors or the committee, and the board or committee in good faith authorized the contract or transaction by a vote sufficient for such purpose without counting the vote of the interested director or directors; or (2) The material facts as to his interest and as to the contract or transaction were disclosed or known to the shareholders entitled to vote thereon, and the contract or transaction was approved in good faith by vote of the shareholders; or (3) The contract or transaction was fair as to the corporation as of the time it was author-

States Fifth Circuit case of *C & B Sales & Serv., Inc. v. McDonald*, 95 F.3d 1308 (5th Cir. 1996), for the principle that, because the ETPOA's Board of Directors "receive a financial interest" (in that "[l]ot and Dwelling owners (all of which are members of the Board of Directors) are subsidized by Lot owner's payment of their assessment"), "pursuant to 12:84 [sic] the action by the Board is void." The Shorts do not explain how this case supports their position, and we find their reliance on it misplaced. The *C & B Sales & Serv., Inc.*, case involved claims against a company president regarding certain business transactions that amounted to a breach in fiduciary duties and fraud, issues vastly different from the issues presented here.

In this matter, the only defendant is the ETPOA; no individual member of the Board of Directors has been sued. The Shorts cannot point to any evidence in the record that the contracts at issue (i.e., the covenants) were drafted by the ETPOA, or any members of the Board of Directors, in a manner that would invoke the application of La. R.S. 12:84. Nor does the record support a finding that the ETPOA engaged in any fraud or self-dealing as alleged by the Shorts; to the contrary, the ETPOA simply implemented the covenants as they were written. Accordingly, we find the statute to be inapplicable to this case.

We likewise find no merit to the Shorts' assertion that, because they were induced to purchase the vacant lot by assurances that only one assessment would be levied against them, the ETPOA could not thereafter charge an equal assessment of their vacant lot, as provided by the covenants. The Shorts admit that in either 2005 or 2006, the ETPOA began to charge a separate assessment for the vacant lot, which they paid through July, 2009 (the minor underpayment notwithstanding), clearly even after they sold their home in 2007. The record reflects that, on January 9, 2004, the secretary/treasurer of the ETPOA wrote to the Shorts advising that, although "multiple lot owners were charged property owners' dues for (1) lot" in the past, the covenants expressly provided that the lot and dwelling owners would pay equal assessments. The letter advised that "[n]ow that the Property Owners Association is self-sufficient, it no longer makes sense for assessments for multiple lot owners to be administered differently than for other Property Owners"; thus, the ETPOA "has decided to change this previous practice." This new policy had been "resolved" at a meeting held on October 15, 2003; to avoid paying multiple assessments, the Shorts were advised that they could "re-subdivid[e] their lots into one (1) lot"

The Shorts do not make the argument that the ETPOA had abandoned the building restriction requiring the payment of assessments. We recognize that a building restriction may be abandoned as provided by La. C.C.art. 782, which states that "[b]uilding restrictions terminate by abandonment of the whole plan or by a general abandonment of a particular restriction. When the entire plan is abandoned the affected area is freed of all restrictions; when a particular restriction is abandoned, the affected area is freed of that restriction only."

This Court has indicated that "there is no abandonment of subdivision restrictions unless violations have been such that there has been a subversion of the original

ized, approved or ratified by the board of directors, committee, or shareholders.
B. Common or interested directors may be counted in determining the presence of a quorum at a meeting of the board of directors or of a committee which authorized the contract or transaction.

scheme of the subdividers, resulting in a substantial change in the intended nature of the subdivision." *Lakewood Estates Homeowner's Ass'n, Inc.*, 02–1864 (La. App. 4 Cir. 4/30/03), 847 So.2d 633, 638. The *Lakewood Estates* court, in determining whether a homeowners association that had previously charged one assessment to the owners of two lots could thereafter enforce a provision whereby each lot paid a separate assessment found that the "the Association did not abandon the right to collect the assessments... [B]y paying [the] assessments in 1995 and 1996, the defendants interrupted any possible abandonment." *Id.*, p. 7, 847 So.2d at 639. Indeed, in that case, the Association had notified the homeowners in 1990 that they owed two assessments for their lots.

Here, we need not decide whether the ETPOA abandoned its right to collect the assessments for the vacant lots. Because the Shorts paid the assessments for years after being notified in 2004 that they would thereafter owe an assessment for the lot and the dwelling as provided by the covenants, any abandonment would have been interrupted, as we found in *Lakewood Estates*. Moreover, as we have already concluded, the Shorts are bound by the specific terms of the covenants to pay the assessments as expressly set forth therein.

### Interest

In its appeal, the ETPOA maintains that the trial court erred in awarding judicial interest of 4% rather than conventional interest of 12%. We note that the judgment awards judicial interest from the date of demand; there is no other reference to interest in the judgment, although it does award "Late Charges and or [sic] Penalties of 10% in the sum of $1,810.90." At the status conference following the motion for new trial, the trial court made it clear that it was not awarding the interest sought by the ETPOA, but rather, only judicial interest.

The ETPOA points to Section 9.08 the covenants which provide, in pertinent part, as follows:

9.08 <u>Effect of Nonpayment; Remedies of the Association</u>. Any assessments of an owner... which are not paid when due shall be delinquent. Any assessment delinquent for a period of more than ten (10) days after the date when due shall incur a late charge in an amount as may be determined by the Board from time to time and shall also commence to accrue simple interest at the maximum rate of eighteen (18%) percent per annum, but in no event to exceed the maximum rate authorized by Louisiana law.

The ETPOA takes the position that the Covenants "set[ ] forth the applicable interest rate in exact and precise terms, which is the maximum rate authorized by Louisiana law, capped at an absolute maximum of 18% per annum." It further notes that conventional interest under La. R.S. 9:3500 "cannot exceed twelve percent per annum." It then argues that the covenants provided for it to charge a rate of 12%, the maximum conventional rate under Louisiana law, and that the trial court erred in awarding it interest in the amount of 4%. We disagree.

The terms for charging a late fee under Section 9.08 are neither exact nor precise. Rather than setting forth a definite rate of interest, Section 9.08 sets forth a range for the interest rate "as may be determined by the Board from time to time" which can be at any amount, so long as it is no more than "eighteen (18%) percent per annum" and so long as it does not "exceed the maximum rate authorized by Louisiana law." Under these terms, the Board could arbitrarily choose any rate between zero (0) percent and twelve (12) percent, the

maximum rate for conventional interest.[9] Had the covenants specifically provided that the ETPOA could charge interest on unpaid assessments in the amount of twelve percent ₁₄(12%), as the ETPOA seeks to do in this matter, there would be no issue, as that is the maximum amount permitted by law; and the parties would be bound by that term.

The covenants, though, do not comply with La. R.S. 9:3500 C(1), which provides that conventional interest "must be fixed in writing; testimonial proof of it is not admitted in any case." We believe the term "fixed in writing" indicates that the interest rate set forth in a contract must be "fixed." That is, it must be certain so that the parties are mutually clear as to the amount of interest being charged. *See, e.g., Gold, Weems, Bruser, Sues & Rundell v. Granger,* 06–859 (La.App. 3 Cir. 12/29/06), 947 So.2d 835, 843 ("[i]t is allowable under Louisiana law for an attorney to charge a client interest on sums overdue as long as that interest rate is spelled out in a contractual agreement").

The covenants in this matter do not explicitly set forth the interest rate and are, thus, not "fixed in writing." Moreover, under the Louisiana Homeowners Association Act, La. R.S. 9:1141.1, *et. seq.* ("the Act"):

> Upon the filing of a sworn detailed statement in accordance with this Part, an association of owners of lots in a residential or commercial subdivision shall have a privilege upon the lot and improvements thereon of an owner in the subdivision who fails to pay charges, expenses or dues imposed upon such lot and improvements thereon in accordance with recorded restrictions, servitudes, or obligations affecting such subdivision.... The privilege shall secure unpaid charges, expenses or dues imposed by the association of owners, *together with legal interest from the date due* and reasonable attorney's fees.

La. R.S. 9:1145. (Emphasis added). It is clear that the privilege afforded under the Act includes legal interest.

₁₅Based on the provisions of this statute and the ambiguity in the covenants' terms concerning interest, we find that the ETPOA is entitled only to legal interest. We, therefore, find no error in the trial court's award of judicial interest. However, the judgment states that judicial interest is owed "from the Date of Judicial Demand." La. R.S. 9:1145 provides that judicial interest is owed from the date that the unpaid dues (assessments) are owed. We therefore amend the judgment to reflect that judicial interest is owed from the date that the assessments became due.

We pretermit a discussion of whether, as the Shorts contend, "the interest rate charged by the ETPOA is in excess of what was allowed by law under the Louisiana Home Owners Association Act" such that "interest is forfeited pursuant to LSA 9:3501 [sic]." [10] Because we find that, under

---

9. Our law makes a *distinction* between legal interest and conventional interest and, as set forth in La. R.S. 9:3500, "[t]he amount of the conventional interest cannot exceed twelve percent per annum." La. R.S. 9:3500 C(1). While La. R.S. 9:3500 does not defined the term "conventional interest," we have recognized that "[c]onventional interest presupposes a contract." *Stewart v. Ainsworth,* 446 So.2d 474, 475 (La. App. 4 Cir. 1984); *see also, Liquidation of Canal Bank & Trust Co.,* 211 La. 803, 823, 30 So.2d 841, 848 (1947) ("...interest is either conventional, in accordance with the contract or agreement, or legal, as fixed by law").

10. La. R.S. 9:3501 provides that "[a]ny contract for the payment of interest in excess of that authorized by law shall result in the forfeiture of the entire interest so contracted." The statute applies to agreements which charge usurious rates of interest. *See, e.g.,*

the circumstances of this case, the ETPOA is only entitled to judicial interest, we need not address whether the terms of the covenants invoke the application of La. R.S. 9:3501 (although we note that the covenants specifically limit the interest rate to the maximum allowed under Louisiana law and as on that basis, could not be found usurious).

### Late Charges

■ As noted, the trial court's amended judgment awarded late fees/penalties in the amount of ten percent (the trial court's award of $1,810.90 is 10% of the award for past due assessments and grass cutting fees). The Shorts take the position that "the late fee of 10% combined with the usurious 12% interest fees continues to be in excess of the interest allowed by law under 9:1145 [sic] which is legal interest." They further argue that La. R.S. 9:1145 "does not allow for a late fee."

While we disagree with the Shorts that La. R.S. 9:1145 does not allow for a late fee (an "unpaid charge" could certainly include a late fee), we find that the record does not support the trial court's award for late fees. Section 9.08 of the covenants state that an assessment that is more than ten days overdue "shall incur a late charge in an amount as may be determined by the Board from time to time...." The only testimony at trial as to the late charge came from Keith Gauchet, who testified as follows:

Q: Now, according to the declaration, the Association, the English Turn Property Owner's Association is entitled to collect a late charge, and the Board of Directors has set, in accordance—has set that late charge at ten percent, is that correct?

A: That is right.

Q: So if it's not paid within 30 days of the date due, there's a ten percent late charge; is that correct?

A: Yes.

The only other specific discussion of the late charges came when the trial court asked counsel for the ETPOA what the amount of the late charges was, and counsel advised that the late charges were "1,418." There is nothing in the record which substantiates a late charge of 10%. While Section 9.08 provides that an overdue assessment "shall incur a late charge as determined by the Board from time to time," there is no documentation that confirms what the late charge will be. Mr. Gauchet testified that there was a resolution passed which set the interest rate and penalties, no such resolution was offered into evidence at trial. Like the "interest rate" provisions of the Covenants, we find no precise or definite term for late charges to be imposed. Absent an exact method by which late charges are to be determined, there is no basis for the imposition of a late charge in the amount of ten percent. We therefore vacate the award for late charges/penalties.

### Attorney's fees

■ Both the ETPOA and the Shorts have appealed the award of attorney's fees. The ETPOA has not challenged the amount of the award for attorney's fees but seeks an award of additional fees incurred in the handling of this appeal. The Shorts maintain that, because the ETPOA "unfairly invoiced the Shorts for the Assessment," thereby leading "to the need for litigation," an award for attorney's fees was not warranted. In the alternative, the

*Ganus v. Jopes,* 470 So.2d 237 (La. App. 4 Cir. 1985); *Williams v. Alphonse Mortg. Co.,* 144 So.2d 600 (La. App. 4 Cir. 1962); *Walker, Tooke & Lyons, L.L.P. v. Sapp,* 37,966 (La. App. 2 Cir. 12/10/03), 862 So.2d 414; *Blanchard v. Progressive Bank & Trust Co.,* 413 So.2d 589 (La. App. 1 Cir. 1982).

Shorts maintain that there is no evidence as to the reasonableness of the award for attorney's fees in this case.

It is axiomatic that "attorneys' fees are not recoverable unless expressly authorized by statute or by a contract between the parties." *KeyClick Outsourcing, Inc. v. Ochsner Health Plan, Inc.*, 11–0598, p. 11 (La.App. 4 Cir. 3/14/12), 89 So.3d 1207, 1213. Attorney's fees are recoverable when a contract provides for the recovery of attorney's fees, including fees incurred by a homeowners association in enforcing a covenant. *See, e.g., Belle Terre Lakes Home Owners Ass'n v. McGovern*, 01–722 (La.App. 5 Cir. 1/29/02), 805 So.2d 1286; *Jackson Square Towne House Home Ass'n, Inc. v. Hannigan*, 38,239 (La. App. 2 Cir. 3/3/04), 867 So.2d 960, 961. It is clear, therefore, that the ETPOA is entitled to an award for attorney's fees.

As to the issue of the reasonableness of the award, we note that the trial court awarded attorney's fees of 35% of the total award for the outstanding assessments, grass cutting fees and penalties. While not expressly stating the basis of this award, it is clear that the trial court relied on the contract between the ETPOA and counsel for the ETPOA, which states that "[t]he attorney's fees for services rendered in connection with each matter submitted to [the attorney] will be thirty-five (35%) percent of all fund received, including principal, late charges, interest, costs, and attorney's fees." We have noted that "[a] court may consider a contingency fee contract when awarding attorney's fees, but the court is not bound by the contract's terms." *Norfleet v. Lifeguard Transp. Serv., Inc.*, 05–0501, pp. 18–19 (La.App. 4 Cir. 5/17/06), 934 So.2d 846, 859. In *Norfleet*, this Court noted that certain factors are to be considered in determining the reasonableness of an award of attorney's fees, including:

1) the ultimate result obtained; 2) the responsibility incurred; 3) the importance of the litigation; 4) the amount of money involved; 5) the extent and character of the work performed; 6) the legal knowledge, attainment, and skill of the attorneys; 7) the number of appearances made; 8) the intricacies of the facts involved; 9) the diligence and skill of counsel; and 10) the court's own knowledge.

*Id.*, p. 19, 934 So.2d at 860, citing *State, Dep't of Transp. and Dev. v. Williamson*, 597 So.2d 439, 442 (La.1992).

Considering the record in this matter, the issues raised by the parties, the number of appearances in court, we find no abuse in the trial court's award of attorney's fees. *See, Discover Bank v. Rusher*, 10–0850, p. 3 (La.App. 4 Cir. 12/8/10), 53 So.3d 651, 653 ("[t]he trial court is vested with great discretion in arriving at an award of attorney's fees, the exercise of which will not be reversed on appeal absent a showing of clear abuse of that discretion"). However, because we have found that the record lacks evidence to support the award for late charges/penalties and have amended the judgment to eliminate this award, the attorney's fees award must also be reduced correspondingly. We amend the judgment to reflect an award of attorney's fees of $6,338.15 (35% of the overdue assessments and grass cutting fees).

We note that in *Norfleet*, this Court refused to award additional attorney's fees incurred in the appeal, despite the fact that the contract specifically allowed for additional attorney's fees if an appeal was filed because the appeal was filed by plaintiffs, who prevailed in the trial court. This court has also indicated that, "in cases where attorney fees were awarded by the trial court, the appeal has necessitated additional work on the part of plaintiff's

counsel, and the defendant has obtained no relief on appeal, ... an award of attorney fees for the defense of an appeal is merited." *Motton v. Lockheed Martin Corp.*, 03-0962, p. 25 (La.App. 4 Cir. 3/2/05), 900 So.2d 901, 919. In *Motton*, this Court increased an award for attorney's fees incurred in the appeal, on a showing by plaintiff's counsel upon "a showing that additional work, in the amount of 171.00 hours, on the part of plaintiff's counsel was necessitated at a rate of $200.00 per hour." *Id.*

Here, the ETPOA was awarded attorney's fees but sought an appeal, as did the Shorts; and, as demonstrated herein, both the ETPOA and the Shorts are obtaining some form of relief. We decline, therefore, to award additional attorney's fees to the ETPOA for this appeal.

### Lien

The final issue in this appeal concerns the lien filed by the ETPOA. The Shorts note that the trial court, which refused to allow testimony regarding the lien at the trial of this matter, allowed discussion of it at the hearing on the motion for new trial and the status conference (continuation of the hearing on the motion for new trial). Thereafter, the trial court included language it the amended judgment which "recognizes a lien and privilege by the" ETPOA over the lot at issue "in accordance and consistent with" the judgment. The Shorts maintain that the trial court, being a court of limited jurisdiction, had no authority to recognize the lien, which was "far in excess of the judgment and the amended judgment." They argue that the "ETPOA used this lien language to wrongfully deprive the Shorts of their property when the lot was eventually sold." [11]

A review of the trial transcript reflects the following colloquy between counsel for the ETPOA and Mr. Gauchet regarding the lien:

Q: ... You [Mr. Gauchet] did sign and file the Affidavit for Privilege against the Shorts' property; did you not?

Mr. Gauchet: I did.

Mr. Delesdernier: I'm just going to object to the issues regarding the privilege. This Court has no jurisdiction over the real estate elements of this. I don't really have a problem, one way or another. It's not a contention. It's just this Court can't enforce, indulge due privilege. We're in the wrong Court for this.

The Court: That's true. I'll sustain that. Therefore, it's irrelevant, but it's just information. You can continue.

No other discussion regarding the lien or evidence was proffered into the record regarding the lien. The bases for motions for new trial are set forth in La.C.C.P. arts. 1972 and 1973.[12] While the trial court had grounds to consider the motion for new trial on the other issues (because, arguably, the judgment was contrary to the evidence presented on those issues), there was no basis for the trial court to grant a new trial on the issue of the lien as

11. The record contains no information about the sale of the lot other than that contained in the parties' briefs, which cannot be considered by this Court. "Appellate courts are courts of record and may not review evidence that is not in the appellate record, or receive new evidence." *2400 Canal, LLC v. Bd. of Sup'rs of Louisiana State Univ. Agr. & Mech. Coll.*, 12-0220, p. 12 (La.App. 4 Cir. 11/7/12), 105 So.3d 819, 827.

12. La. C.C.P. art. 1972 allows for the grant of a new trial when a judgment is clearly contrary to the law and evidence, on the basis of newly discovered evidence or when a jury was bribed or behaved improperly. Otherwise, a new trial me be granted when "there is good ground therefor," as provided in La. C.C.P. art. 1973.

the court did not allow any evidence of the lien at trial and there was no objection to the ruling or proffer made. We, therefore, amend the judgment to vacate the trial court's reference to the lien and privilege.[13]

## CONCLUSION

For the reasons set forth herein, the judgment of the trial court is amended so as to reflect the following: (1) judicial interest accrued from the date that each assessment became due; (2) the award for late charges is vacated; (3) the trial court's recognition of the lien and privilege is vacated. In all other respects, the judgment of the trial court is affirmed.

AMENDED IN PART, VACATED IN PART, AND AFFIRMED.

---

13. We do note, though, that a copy of an Affidavit for Privilege, signed by Mr. Gauchet and filed into the mortgage records for Orleans Parish, was attached to the ETPOA's original Petition. The Petition alleged that the ETPOA "is entitled to recognition of its lien and privilege resulting from the filing of the said affidavits for privilege." Under La. R.S. 9:1145, the ETPOA "shall have a privilege upon the lot" of an owner who "fails to pay charges, expenses or dues imposed upon such lot.' The privilege is perfected "[u]pon the filing of a sworn detailed statement in accordance with this Part." The Shorts have not argued that the privilege was improperly perfected in this case.